HENRY. BRUSH, APPELLANT, v. JOHN H. WARE AND OTHERS, APPELLEES.

The executor of an officer in the Virginia line on the continental establishment, obtained a certificate from the executive council of Virginia, as executor, for four thousand acres of land in the Virginia reserve, in the state of Ohio; and afterwards sold and assigned the same. Entries were made, and warrants issued in favour of the assignees, and a survey was made under one of the warrants, in favour of one of the assignees, a bona fide purchaser, who obtained a patent from the United States for the land. It appeared that the executor had no right, under the will, to sell the land to which the testator was entitled. The patent was granted in 1818, and the patentee had been in possession of the land from 1808. The heirs of the officer, entitled to the land for military services, in 1839, some of them being minors, filed a bill to compel the patentee to convey the land held by him to them. Held, That the patentee was a purchaser with notice of the prior title of the heirs; and that he was bound to make the conveyance asked from him.

Whatever doubts on common law principles might have existed on the question, whether the Court can go behind the patent for lands, and examine the equity asserted in a bill claiming the land against the patent, in Ohio and Kentucky, this question has been long judicially settled; and this Court, following the decisions of those states, have also decided it. The cases of Bodley et al. v. Taylor, 5 Cranch 196, and Polk's lessee v. Wendall, 9 Cranch, 93. 5 Wheat. 293. Miller et al. v. Kerr, 7 Wheat. 1. Hoofnagle v. Anderson, 7 Wheat. 212, cited.

A patent appropriates the land called for, and is conclusive against rights subsequently acquired. But when an equitable right, which originated before the date of the patent, whether by the first entry or otherwise, is asserted, it may be examined.

A patent for land under the Virginia land law, as modified by usage and judicial construction in Kentucky and Ohio, conveys the legal title, but leaves all equities open.

To make a valid entry, some object of notoriety must be called for; and unless this object be proved to have been generally known in the neighbourhood of the land, at the time of the entry, the holder of a warrant who enters the same land with full notice of the first entry, will have the better title. And so if an entry be not specific as to the land intended to be appropriated, it conveys no notice to the subsequent locator; nor can it be made good by a subsequent purchase without notice. But, with those exceptions, the doctrine of constructive notice has been considered applicable to military titles as in other cases; and no reason is perceived why this rule should not prevail. From the nature of these titles, and the force of circumstances, an artificial system has been created; unlike any other; and which has long formed the basis of title to real estate in a large and fertile district of country. The peculiarities of this system having for half a century received judicial sanctions, must be preserved; but to extend them would be unwise and impolitic.

No principle is better established than that a purchaser must look to every part of the title which is essential to its validity.

[Brush *v.* Ware et al.]

An executor has not, ordinarily, any power over the real estate. His powers are derived from the will, and he can do no valid act beyond his authority. Where a will contains no special provision on the subject, the land of the deceased descends to his heirs; and this right cannot be divested, or impaired by the unauthorized acts of the executor.

The law requires reasonable diligence in a purchaser to ascertain any defect of title. But when such defect is brought to his knowledge, no inconvenience will excuse him from the utmost scrutiny. He is a voluntary purchaser, and having notice of a fact which casts doubt on the validity of his title, the rights of innocent persons are not to be prejudiced through his negligence.

THE appellees, John H. Ware and others, heirs of John Hockaday, an officer in the Virginia line on the continental establishment, filed their bill in the Circuit Court of Ohio, against the appellant, Henry Brush, and against others, for the recovery of certain lands in the state of Ohio, in the military reservation. John Hockaday was entitled, under the acts and resolutions of Congress, to four thousand acres, in the Virginia military reserve. Afterwards, on the motion of the complainants, the bill was dismissed as to all the defendants except Henry Brush; and a decree having been entered in the Circuit Court in favour of the complainants, Henry Brush prosecuted this appeal.

As the heirs of John Hockaday, the complainants, claimed title to the land in question. John Hockaday made his will, disposing of his personal property only; and Ware, one of the executors, proved the will. As executor of Hockaday, he made a fraudulent sale of the military right of the testator to one Joseph Ladd, and having obtained from the executive council of Virginia, a certificate of the right of John Hockaday for the land to which he was entitled, he assigned the same to John Ladd. On this certificate Ladd obtained, as the assignee of Ware, executor of John Hockaday, four warrants, each for one thousand acres. Part of the land, under one of these warrants, through assignments to George Hoffman and others, became the property of Henry Brush; who, under an entry made by George Hoffman, obtained a patent for the land held by him from the United States, on the twenty-third of January, 1818.

The bill of the appellees asserts that Henry Brush was a purchaser with notice of the superior title of the heirs of John Hocka-

day, and prays that he may, by a decree of the Court, be directed to convey the land to them, they having the prior equity.

In the answer of Brush, he says, the land in controversy was granted to him by patents, dated January 23, 1818; that he has no recollection or belief that he ever saw the warrant, entry, or survey, or copies of either; that he is an innocent purchaser for a valuable consideration: he denies all notice of complainant's claim, at or before the emanation of the patents, and all knowledge of any fraud: he says he believes that the purchase by Ladd was fair, and for a valuable consideration: that he had no knowledge what the will of Hockaday contained: he says he has been in possession, under claim of title, since 1808, and has made lasting and valuable improvements; and insists that complainants ought to be barred by the statute of limitations: and that at any rate he ought to be paid for all improvements. And by his amended answer, he claims compensation for taxes paid, and for an allowance for a locator's share; for expenses in perfecting the title; and claims all the surplus land in the surveys.

The case was argued by Mr. Mason, for the appellant. No counsel appeared for the appellees.

Mr. Mason:—The appellant is a purchaser for valuable consideration without actual notice, and holds the land in controversy by patent from the United States.

The heirs of John Hockaday, deceased, are proceeding by bill in chancery, to recover the land, on the alleged ground that the assignment of the claim of their ancestor to bounty-land was made by his executor without authority, and, consequently, that their rights are not divested or impaired by that transfer.

Having acquired the legal title without notice of any adversary claim, the appellant is entitled to the aid and protection of the Court; "and upon this principle, that all men who stand on equal ground, shall have equal equity; because the Court cannot do any thing for one without injuring the other." No title can be better than the title of such a purchaser. If he has a legal title, the Court cannot interpose. Lord Drogheda *v.* Malone, Finley's Digest; cited in note to Mitford's Ch. Pl. 3d. Am. ed. p. 340.

[Brush *v.* Ware et al.]

Is the appellant affected by constructive notice?

Presumptive notice is where the law imputes to a purchaser the knowledge of a fact, of which the exercise of common prudence and ordinary diligence must have apprized him. As where a purchaser cannot make out a title but by a deed which leads him to another fact, whether by description of the parties, recital, or otherwise, he will be deemed connusant thereof.

Constructive notice is, in its nature, no more than evidence of notice, the presumptions of which are so violent, that the Court will not allow of its being controverted. 2 Sug. Vend. 292. Newl. Cont. 511.

In Dexter *v.* Harris, 2 Mason's C. C. Rep. 536, Mr. Justice Story says: "There is no such principle of law, as that what is matter of record shall be constructive notice to a purchaser. The doctrine upon this subject, as to purchasers, is this, that they are affected with constructive notice of all that is apparent upon the face of the title deeds, under which they claim, and of such other facts as those already known necessarily put them upon inquiry for, and as such inquiry, pursued with ordinary diligence and prudence, would bring to their knowledge. But of other facts extrinsic of the title, and collateral to it, no constructive notice can be presumed; but it must be proved."

In Flagg *v.* Man, 2 Sumner's C. C. Rep. 556, the same learned judge, after stating that constructive notice could not be rebutted, thought that the cases he had referred to, ought to "admonish Courts of Equity in this country, where the registration of deeds, as matters of title, was universally provided for, not to enlarge the doctrine of constructive notice, or to follow all of the English cases on this subject, except with a cautious attention to their just application to the circumstances of our country, and to the structure of our laws."

Chancellor Kent (4 Com. p. 172, old ed.) declared, "It was, indeed, difficult to define, with precision, the rules which regulate implied or constructive notice, for it depended upon the infinitely varied circumstances of each case." I shall contend that the doctrine of constructive notice is not applicable to grants for land issued by public authority; nor does it apply to the purchaser of a military land warrant issued by the state of Virginia; nor to the

purchaser of an entry or survey in the state of Ohio, made in virtue of such warrant.

1. Because there is a legal presumption, that the acts of the public agents employed to superintend and conduct the proceedings from the commencement of an inceptive title to its consummation in a grant, have been in conformity with law.

2. Because the purchaser, though put upon inquiry by facts already known, cannot, by the exercise of ordinary diligence and prudence, arrive at the knowledge of other facts necessary to be known.

3. Because in the case of military warrants, they are issued by the authority of a sovereign state, in pursuance of law ; and the legal presumption is, that its officers have performed their duty in executing the trusts confided to them.

4. Because, lastly, such warrants are transferable by assignment; and ought to pass, like commercial paper, into the hands of a bona fide purchaser, discharged from all equities, of which he had not actual notice.

These propositions he hoped to maintain, both upon reason and authority.

The doctrine of constructive notice has been too long established, to be now called in question. Therefore, it is not denied to be law, as applied by Courts of Equity to deeds, and other instruments of writing for the transmission of real estate from one individual to another. Public grants are supposed to rest upon a different foundation from that of private conveyances. They emanate from the sovereign power of the country, according to certain rules and forms of proceeding prescribed by itself, for the regulation of its own action. And when so issued, no matter what recitals the patent may contain, " every man has a right to draw from the existence of the grant itself," the " inference that every prerequisite has been performed," and that these rules have been complied with on the part of the grantor. The legal presumption is in favour of the validity of every grant issued in the forms prescribed by law."

These presumptions are not understood to exist in favour of deeds and other transactions between private citizens; on the contrary, such deeds are not of themselves proof of title, and can be made so only by the aid of extrinsic evidence.

A deed or will is merely a link in the chain of title, of which a patent is the beginning. The former transmits a legal title already in existence—the latter creates the legal title, and brings it into existence.

A public grant is not only an appropriation of the land, but is itself a perfect title. Green *v.* Lighter and others, 8 Cranch, 247–8.

Officers are appointed and commissioned by the government for the express purpose of conducting and supervising all the preliminary proceedings from the origin to the consummation of the title; and when these incipient measures are completed, and the grant issued, the law presumes that the government agents have performed their duty, and that the grant is valid. In one word, it is a legal presumption, in favour of a patent, that there are no defects behind it, by which it can be invalidated, or avoided. But, notwithstanding this presumption, it is admitted that defects may, in fact, exist. And hence, it is contended on the other side, that if the patent contains recitals which would fairly conduct an honest inquirer to the discovery of these defects, a purchaser is justly chargeable with notice of them, whether he made inquiry or not. And this upon the principle that he is guilty of crassa negligentia, in not examining the nature and extent of a danger of which he had thus received notice. Will the law impute gross negligence to a purchaser for omitting to search for defects in the origin of his title, in a case where the law, at the same time, presumes that no defects exist? Is not one presumption inconsistent with the other? Can they both exist together in the same case? And if they cannot, which ought to yield? Can it be tolerated, as just, in any system of jurisprudence, that the law should first invite the confidence of the purchaser; and then turn against him, and treat that very confidence as criminal?

The executive of the United States has authority to issue patents to purchasers of the public lands. Indeed, it is one of the duties imposed upon him by the laws of Congress; and to see that the laws are faithfully executed, is as imperative on him in this branch of the public service, as it is in any other. In the discharge of that duty, the exercise of a wider latitude of discretion and judgment, than is permitted in most other cases,

[Brush *v.* Ware et al.]

is necessarily confided to that officer. He must be the judge of the sufficiency and regularity of the various preliminary steps required to be taken toward the completion of a legal title, and see that these prerequisites have all been complied with. The nature and extent of this discretion, could not be better illustrated, than by referring to the duties required to be performed by the executive under our system of pre-emption laws, daily becoming more complicated. From the number of public agents employed, and from the character and variety of their duties, in the disposal of the public lands, the inference is irresistible, that errors must be committed. If, under such a state of things, the purchaser is to be affected with notice of these irregularities, and that, too, after the emanation of the patent, there can be no security in land titles, no confidence in the action of the government.

But ought not the acts of the highest officer in the republic, when performed in the execution of a function prescribed by law, and requiring the exercise of judgment and discretion, to be regarded by the citizen, as valid and conclusive?

A contrary presumption, or the absence of any presumption in favour of the acts of a public officer, when performed within the sphere of his duty, would make it necessary for the private citizen, if he would avoid the consequences of constructive notice, to visit the land office and examine the records there; and at Washington city, to satisfy himself that the officers had fulfilled their duty, before he could venture to become a purchaser. Upon this theory, he must re-judge, and at his own peril, what had already been adjudicated by a competent officer, charged with that particular duty.

In such a case, he might differ from the officer; and the Court from both.

The executive of the United States, in issuing patents for land, is required to perform, and does perform certain acts of a judicial nature. And when an executive officer acts judicially, as he often must, (for the idea of a perfect separation of the powers of government, is a mere abstraction, and wholly unattainable in practice,) his decisions are as valid, and have the same effect as judgments pronounced by Courts of justice; and are, ordinarily, far more difficult to revise, if erroneous, than the latter.

Judicial power, by whomsoever exercised, is judicial power still, and its determinations, whether announced from the bench, or at the council-table, have all the authority of adjudications made in conformity with law, and are entitled to be respected as such. The President prescribes the form of the grant, and decides from the evidence before him, whether a patent ought to issue; and whether the applicant, or which of the applicants, if more than one, is entitled to have the grant.

The presumption of law is, that he has decided these questions correctly; and, therefore, the purchaser is not obliged, in order to protect himself, to examine the grounds of the decision.

This is a contest between parties claiming under the same title.

In this case, the patent is valid upon its face; it was not issued without authority; it was not protected by statute; the United States had title to the thing granted; and hence the patent cannot be impeached collaterally in a Court of law.

In support of the foregoing principles the Court are referred to the following cases, viz.: Polk's Lessee v. Wendall, 9 Cranch, 87; S. C. 4 Cond. Rep. 650. Patterson v. Winn, 6 Cond. Rep. 355. Patterson v. Jenks et al. 2 Pet. Rep. 216. Stringer et al. v. Lessee of Young et al. 3 Peters, 320. Boardman et al. v. Lessee of Reed & Ford et al. 6 Peters, 328. United States v. Arredondo et al. 6 Peters, 727—732. Miller v. Kerr, 5 Cond. Rep. 202. Hoofnagle et al. v. Anderson, 5 Cond. Rep. 271. Bouldin and Wife v. Massie's Heirs, 5 Cond. Rep. 252.

It is a presumption of law, that public agents and officers, appointed by government, have properly executed their office, and complied with the law, in discharging the duties imposed on them. Jackson v. Marsh, 6 Cow. 281; 4 Cranch, 431. Taylor v. Brown, 5 Cranch, 242; 9 Cow. 110; 19 Johns. Rep. 347; Buller's N. P. 298. Williams v. East India Company, 3 East's Rep. 192. Strother v. Lucas, 12 Peters, 437.

Every act required to be done from the commencement to the completion of a military title, derived from the laws of Virginia, is either performed by, or submitted to the cognisance of, an officer appointed for that particular purpose.

Now, as there is a legal presumption in favour of the acts of these officers, I maintain that there is no place for the application of the doctrine of implied notice to this class of titles. The idea

of presumptive notice is met and repelled by an antagonist presumption.

Again, the distinction between a patent issued by the sovereign authority, and deeds from one citizen to another, is well illustrated by the fact, that the former, unless it is void upon its face, or has issued without authority, or is prohibited by statute, can only be set aside by a regular course of pleading, in which the fraud, irregularity, or mistake, is directly put in issue. And the state only can take advantage of an improvident or mistaken grant. 3 Black. Com. 261. 1 Mum. 134. 2 Wash. 55. 4 Monroe, 51. 4 Bibb, 329. 5 Monroe, 213. 12 Johns. Rep. 77. 10 Johns. Rep. 23. 1 Mason, 153. 1 Hen. & Mum. 306. 4 Johns. Rep. 143. 2 Bibb, 628. 487.

The statute of frauds and perjuries has no application to public grants. Neither fraud, nor the want of consideration, can be averred as grounds to impeach a patent on the application of a creditor.

But the doctrine of constructive notice does not apply to the purchaser of a military warrant, an entry, or a survey.

Without intending to say that a warrant is not necessary to the validity of an entry, or that a survey would be good without an entry, I contend that a warrant is to be presumed from the existence of an entry; on the principle, that as it would be a violation of duty on the part of the principal surveyor to make or record an entry without the authority of a warrant; and as the law will presume that the officer has duly executed his office, it follows, therefore, that an entry is proof, till the contrary appears, of the existence of a warrant.

For the same reason a survey is presumptive evidence of the existence of an entry duly made. These are official acts, performed by officers appointed by public authority, and sworn to perform these duties. And the law gives them credit for fidelity till the contrary is shown; and nothing, surely, can be more just and reasonable.

Besides, as the law does not direct the warrant to be recorded in the surveyor's office, and as it is not, in practice, recorded there, it may not be accessible to the purchaser; and, therefore, it would be unreasonable to charge him, by implication, with a

I 2

knowledge of its contents. It may have been lost, or destroyed, after the entry was made.

The state of Virginia, and afterwards the Congress of the United States, early made provision for these casualties, by making " a certified duplicate of the warrant" equivalent to the original, for the purpose of obtaining a patent. Ohio L. Laws, 115. 133. And for another reason, the warrant may be beyond the reach of the purchaser. It may, at the time, be in the hands of a deputy surveyor, for the purpose of executing a survey of that part of it which had not been surveyed before. Ohio L. Laws, 122.

It is submitted, therefore, that the fact that the warrant may not at all times be within reach of the purchaser, affords a reason why he ought not to be affected with constructive notice of its contents.

But, again, no more than ordinary diligence and prudence are required of a purchaser, in the cases where the doctrine of implied notice is admitted to be applicable. For, if a higher degree of diligence and attention than ordinary becomes necessary, the rule itself ceases. What are the facts of the case? The lands lie in the state of Ohio, where the office of the principal surveyor for the district is established. The tribunal that receives the evidence and adjudicates the right of the original claimant to bounty land, and which gives the certificate; and also the office which issues the warrant, are all established in the state of Virginia, distant not less than six hundred miles from the land. If the claim was assigned before the warrant issued, the evidence of the power of the assignor to transfer the claim will not be found in the office of the principal surveyor in Ohio. It may or may not be found in the office of the Register at Richmond, for I know of no law requiring it to be filed or recorded there.

Suppose, then, a citizen of Ohio or of some other state, wishes to purchase a tract of land in the Virginia military reserve in Ohio, what are the means within his reach, by which he may, in exercising ordinary diligence, shield himself against the consequences of constructive notice? The purchaser goes to the office of the principal surveyor for the district, and by the courtesy of that officer obtains permission to examine the records and

files of the office.   And what does he find there ?   The warrant
may be found there, or it may not, for reasons already stated.
But constructive notice, if applicable at all, must be applied
without regard to whether the warrant can, by any diligence, be
found or not.   If it is in the office, the purchaser will see from
the face of it that it was issued to the soldier himself, or to heirs,
or to an executor, or to a purchaser.   But, in either case, the
law presumes it properly issued ; and, therefore, the law will
not charge the purchaser with knowledge that it was improperly
issued to the warrantee.   Neither the entry nor the survey gives
any notice by which the purchaser is put upon inquiry for the
rights of others ; nor do they furnish any clew by which such
rights can be ascertained.

The warrant may have been assigned before or after its loca-
tion ; in either case, the paper containing the assignment may or
may not be filed in the surveyor's office.

If the requisite information cannot be obtained in the state
where the land lies, will the Court say that ordinary diligence
requires the purchaser to visit the land office at Richmond, to ex-
amine for defects prior to the date of the warrant ?   To do this,
a citizen of Ohio must travel a distance, in going and returning,
of twelve hundred miles.   The expenses of such a journey
would exceed the value of the land, in many instances ; and the
effect would be to exclude from the privilege of purchasing these
lands, all except a few wealthy speculators who might afford to
incur the expense.   I need make no remarks on the justice or
wisdom of such a policy.   Nor will I do more than ask the Court
to reflect on the consequences that must flow from establishing
the doctrine of the Court below ; consequences, which could they
be limited to future transactions would be less disasterous : but
we know they must operate on the past, and affect titles already
acquired, thereby producing an aggregate of injury and suffering
that no sagacity can foresee or calculate.

The case of Reeder v. Barr, 4 Ohio Rep. 446, affords the
first and only instance, as far as I know, in which the doctrine
of implied notice has been applied to the recitals in a patent
issued by the United States for a portion of the public domain.
And the decree from which we have appealed seems to affirm
the doctrine of that case, and to apply it, for the first time, I

believe, to the military titles derived from the laws of Virginia.

During the period of fifty years that these titles have been the subject of litigation in every form known to the law, it is impossible to doubt that many cases must have occurred in which the principle of presumptive notice would have been asserted, if it had been supposed by the Courts, or bar, that such a principle was applicable to a purchaser of these titles. The absence of any adjudication in favour of the doctrine as now applied, is an argument of some force against it.

Mr. Justice M'LEAN delivered the opinion of the Court.

This is an appeal from the decree of the Circuit Court of Ohio.

In their bill the complainants represent, that they are the only heirs and legal representatives of John Hockaday, late of the county of New Kent, in the commonwealth of Virginia.

That Hockaday in the Revolution was a captain in the Virginia line on continental establishment, which, under the acts and resolutions of Congress entitled him to four thousand acres of land, in the Virginia reservation, within the state of Ohio. That in 1799 Hockaday died, leaving as his only child and heir Hannah C. Ware, who had intermarried with Robert S. Ware, and who was the mother of a part of the complainants, and the grandmother of the others.

That Hockaday left a will in which he disposed of his personal estate only, and appointed Ware, with two other persons, his executors. Ware proved the will, the others declining to act; and that he wholly neglected his duties as executor, and never settled the estate. That their mother died in 1805, and Robert S. Ware, their father, also died some years afterwards. That in the year 1808, one Joseph Ladd, who has since deceased, being insolvent and without heirs, fraudulently made a contract with the executor for the sale of the above military right; and having obtained the certificate of such right from the executive council of Virginia, the same was assigned to Ladd for the consideration of forty dollars and a pair of boots. That on this certificate and assignment Ladd obtained four warrants of a thousand acres each, as the assignee of Ware the executor of Hockaday.

One of these warrants was assigned to George Hoffman by

Ladd, and through certain other assignments to Brush. By a part of this warrant the two tracts of land in controversy were entered, and for which Brush obtained patents from the United States, dated the 23d January, 1818. And the complainants allege that Brush was a purchaser with notice of their equity; and they pray that he may be decreed to convey to them the title, &c.

In his answer the defendant states that he was a bona fide purchaser, for a valuable consideration, and without notice of the complainants' equity. And he insists if the Court shall decree for the complainants, that he is entitled to the part usually given to the locator, for making the entry and obtaining the title for the land. And also that he is entitled to moneys paid for taxes, &c., on the land.

This cause has been ably argued on the part of Brush, the appellant.

The question which lies at the foundation of this controversy, and which, in its order, should be first considered, is, whether the Court can go behind the patent, and examine the equity asserted in the bill.

Whatever doubt might arise on this question on common law principles, there can be none when the peculiar system under which this title originated is considered. In Ohio and Kentucky this question has been long settled judicially; and this Court, following the decisions of those states, have also decided it. Bodley and others *v.* Taylor, 5 Cranch, 196.

In the case of Polk's Lessee *v.* Wendall et al. 9 Cranch, 98, the Court say, " that every pre-requisite has been performed, is an inference properly deducible, and which every man has a right to draw from the existence of the grant itself. It would, therefore, be extremely unreasonable to avoid a grant in any court, for irregularities in the conduct of those who are appointed by the government to supervise the progressive course of a title, from its commencement to its consummation in a patent. But there are some things so essential to the validity of the contract, that the great principles of justice and of law would be violated, did there not exist some tribunal to which an injured party might appeal, and in which the means by which an elder title was acquired might be examined." And the Court, after showing

that a Court of Equity was the proper tribunal to make this examination, remark, "But there are cases in which a grant is absolutely void, as where the state has no title to the thing granted; or where the officer had no authority to issue the grant. In such cases the validity of the grant is necessarily examinable at law."

The same case was again brought before the Court by a writ of error, and is reported in 5 Wheat. 293, in which the Court held, that the system under which land titles originated in Tennessee being peculiar, constituted, with the adjudication of its Courts, a rule of decision for this Court.

In the case of Miller and others v. Kerr and others, 7 Wheat. 1, it was held, that an equity arising from an entry of land made on a warrant which had been issued by mistake, could not be sustained against a patent issued on a junior entry. The Court say, "The great difficulty in this case consists in the admission of any testimony whatever which calls into question the validity of a warrant issued by the officer to whom that duty is assigned by law. In examining this question, the distinction between an act which is judicial and one which is merely ministerial, must be regarded. The Register of the land office is not at liberty to examine testimony, and to exercise his own judgment respecting the right of an applicant for a military land warrant."

And in the case of Hoofnagle and others v. Anderson, 7 Wheat. 212, another question was raised on an entry made by virtue of the same warrant.

The mistake in the warrant consisted in this. Thomas Powell having performed military services in the Virginia state line, a certificate by the executive council of Virginia was obtained by his heir, which entitled him to a certain amount of land. On this certificate, the Register of the land office at Richmond, Virginia, issued a warrant, which, instead of reciting that the services were performed in the state line, stated that they were performed in the state line on continental establishment. This mistake was important, as the tract of country in Ohio in which the warrant was located, was reserved, in the cession by Virginia, for the satisfaction only of warrants issued for military services in the state line on continental establishment; and consequently was not subject to the right of Powell. And the Court remark,

how far the patent ought to be affected by this error is the question on which the cause depends. They say there was no ground to suspect fraud; that the warrant was assignable, and carried with it no evidence of the mistake which had been committed in the office; that it had been assigned for a valuable consideration, and the purchaser had obtained a patent for the land without actual notice of any defect in the origin of his title; and they held that the patent gave a good title as against any one whose entry was subsequent to its date.

A patent appropriates the land called for, and is conclusive against rights subsequently acquired. But where an equitable right, which originated before the date of the patent, whether by the first entry or otherwise, is asserted, it may be examined. The patent, under the Virginia land law, as modified by usage and judicial construction in Kentucky and Ohio, conveys the legal title, but leaves all equities open. Bouldin and Wife *v.* Massie's heirs and others, 7 Wheat. 149.

The controversy in this case, does not arise from adverse entries, but between claimants under the same warrant. And it is admitted that Ware, as executor, had no power to assign the military right, which, on the decease of Hockaday descended to his heirs. It is too clear to admit of doubt, that Ladd, by circumvention and fraud, obtained the assignment from the executor, which enabled him to procure the warrant from the register.

As between Ladd and the complainants, can there be any doubt that this case would be examinable in equity? Could the issuing of the warrant, by the Register, interpose any objection to such an investigation?

It is insisted, that the Register, of necessity, before he issues the warrant, must determine the right of the applicant, and that in doing so, he acts judicially. That presumptions not only arise in favour of such acts, but unless fraud be shown, they are not open to examination.

The executive council of Virginia, in determining the right of Hockaday's heirs, may be said to have acted judicially. But the Register, in the language of the Court, in one of the cases above cited, acted ministerially. The Court say he was not authorized to examine witnesses in the case, but was bound to act upon the face of the certificate. The parties interested were not

before him, and he had no means of ascertaining their names, giving them notice, or taking evidence. And under such circumstances, would it not be a most extraordinary rule, which should give a judicial character and effect to his proceeding. He acts, and must necessarily act from the face of the paper, both as it regards the certificate of the executive council, and the assignment of such certificate. His acts, in their nature, are strictly ministerial. They have neither the form nor effect of a judicial proceeding.

It may be admitted that presumptions arise in favour of the acts of a ministerial officer, if apparently fair and legal, until they shall be impeached by evidence. But in this case, there is no impeachment of the acts of the Register. The evidence on which he acted, is stated on the face of the warrant, which enables the proper tribunal, as between the parties interested, to determine the question of right, which the Register had neither the means nor the power to do.

The complainants do not deny the genuineness of the certificate, the assignment, or the warrant, but they say that the executor had no right to make the assignment; and that the issuing of the warrant by the Register does not preclude them from raising that question.

Until the patents were obtained, this warrant, though assigned and entered in part, on the land in controversy, conveyed only an equitable interest. Hoffman, to whom Ladd assigned it, and the other assignees, took it, subject to all equities. In their hands, unless affected by the statute of limitation or lapse of time, any equity arising from the face of the instrument could be asserted against them, the same as against Ladd.

Brush, being the last assignee, obtained the patents in his own name as assignee, and these vested in him the legal estate. But this, on the principles which have been long established, in relation to these titles, does not bar a prior equity. The complainants are proved to be the heirs of Hockaday, and a part of them were minors at the commencement of this suit. All of them, in age, were of tender years, when the warrant was assigned, and it appears that none of them came to a knowledge of their rights, until a short time before the bill was filed. And this is an answer both to the statute of limitations and the lapse

[Brush *v.* Ware et al.]

of time. The statute of Ohio does not run against non-residents of the state ; nor can lapse of time operate against infants, under the circumstances of this case.

The great question in this controversy is, whether Brush is chargeable with notice.

The certificate of the executive council of Virginia stated, that "the representatives of John Hockaday were entitled to the proportion of land allowed a captain of the continental line for three years' service." To this was appended a request to the Register of the land office to issue a warrant, in the name of Joseph Ladd, his heirs or assigns, signed by Ware, executor of Hockaday, he having received, as stated, full value for the same.

Four military warrants, of one thousand acres each, were issued by the Register, "the 9th of August, 1808, to Joseph Ladd, assignee of Robert S. Ware, executor of John Hockaday, deceased."

By virtue of one of these warrants, four hundred acres of the land in dispute were entered the 8th of June, 1809, in the name of George Hoffman, assignee, and two hundred acres, in the same name, the 18th of August, 1810. These entries were surveyed in May, 1810, and on the 20th of January, 1818, patents were issued to "Brush, assignee of John Hoffman, who was assignee of Joseph Hoffman et al., assignees of George Hoffman, who was assignee of Joseph Ladd, assignee of Robert S. Ware, executor of Hockaday," &c.

It is insisted that the general doctrine of notice does not apply to titles of this description. And this position is true, so far as regards the original entry. To make a valid entry, some object of notoriety must be called for ; and unless this object be proved to have been generally known in the neighbourhood of the land, at the time of the entry, the holder of a warrant who enters the same land, with full notice of the first entry, will have the better title. And so, if an entry be not specific as to the land intended to be appropriated, or in any respect be defective, it conveys no notice to a subsequent locator, nor can it be made good by a subsequent purchaser without notice. Kerr *v.* Watts, 6 Wheat. 560. But, with these exceptions, the doctrine of notice has been considered applicable to these military titles, as in other cases. And no reason is perceived why this rule should not prevail.

VOL. XV.—K

From the nature of these titles, and the force of circumstances, an artificial system has been created, unlike any other; and which has long formed the basis of title to real estate, in a large and fertile district of country. The peculiarities of this system, having for half a century received judicial sanctions, must be preserved; but to extend them, would be unwise and impolitic.

Brush, it is insisted, was a bona fide purchaser for a valuable consideration, without notice.

The answer under which this defence is set up, is neither in substance nor in form free from objection. It does not state the amount of consideration paid, the time of payment, nor does it deny the circumstances from which notice can be inferred. Boon v. Chiles, 10 Peters, 211, 212. But, passing over the considerations which arise out of the answer, we will inquire whether the defendant is not chargeable with notice, from the facts which appear upon the face of his title.

The entry on the books of the surveyor, kept at the time, in the state of Kentucky, was the incipient step in the acquisition of the title. This entry could only be made by producing to the surveyor, and filing in his office, the original warrant, or a certified copy of it. The survey was then made, and a plat of the land, by a deputy, who returned the same to the principal surveyor's office. This survey is called the plat and certificate, and is assignable by law; but, without an entry founded upon a warrant, it is of no validity. On the transmission of this survey, under the hand and seal of the principal surveyor, accompanied by the original warrant, or a copy, to the general land office, a patent is issued to the person apparently entitled to it. In issuing the patent, the commissioner of the land office performs a ministerial duty. He examines no witnesses, but acts from the face of the papers, and exercises no judgment on the subject, except so far as regards matters of form. The patent, therefore, conveys the legal title only, leaving prior equities open to investigation.

This is the history of this title, and of every other in the same district of country. And the question arises whether the respondent, under the circumstances, was a bona fide purchaser for a valuable consideration, without notice.

In his answer, he says that he never saw the warrant, the

entries, nor the surveys on which the patents were founded; and that he had no information as to the derivation of the title, except that which the patents contain.

The question is not whether the defendant in fact saw any of the muniments of title, but whether he was not bound to see them. It will not do for a purchaser to close his eyes to facts; facts which were open to his investigation, by the exercise of that diligence which the law imposes. Such purchasers are not protected.

It is insisted that the plats and certificates being assignable, the defendant might well purchase them without a knowledge of the facts contained on the face of the warrant. But was he not bound to look to the warrant as the foundation of his title? The surveys were of no value without the warrant. No principle is better established, than that a purchaser must look to every part of the title which is essential to its validity.

The warrant was in the land office of the principal surveyor; and although this, at the time, was kept in Kentucky, the defendant was bound to examine it. In this office his entries were made, and to it his surveys were returned. And from this office was the evidence transmitted, on which the patents were issued. Can it be contended that the defendant, who purchased an inchoate title, a mere equity, was not bound to look into the origin of that equity? As a prudent man, would he not examine whether that which he bought was of any value? The records of the land office, and the papers there on file, showed the origin of the title, and the steps which had been taken to perfect it. By the exercise of ordinary prudence he would have been led to make this examination; and, in law, he must be considered as having made it.

And here the question arises, whether the statements of the warrant, which were afterwards copied into the patents, that the right originally belonged to Hockaday, descended to his heirs, on his decease, and had been assigned to Ladd, by his executor; were not sufficient to put the defendant on inquiry? Now, an executor has not, ordinarily, any power over the real estate. His powers are derived from the will, and he can do no valid act beyond his authority. Where a will contains no special provision on the subject, the land of the deceased descends to his

heirs; and their rights cannot be divested or impaired by the unauthorized acts of the executor.

The warrant then showed the purchaser that this right, which pertained to the realty, and which, on the death of Hockaday, descended to his heirs, had been assigned by the executor. Was not this notice? Was it not a fact, essentially connected with the title purchased by the defendant, which should have put him upon inquiry? If it would do this, it was notice; for whatever shall put a prudent man on inquiry is sufficient. And this rule is founded on sound reason, as well as law. How can an individual claim as an innocent purchaser, under such a circumstance?

But it is argued that it would impose on the defendant an unreasonable duty, to hold that he was bound not only to examine the warrant in the land office in Kentucky, but to hunt up the will of Hockaday, and see what powers it conferred on the executor.

The law requires reasonable diligence in a purchaser to ascertain any defect of title. But when such defect is brought to his knowledge, no inconvenience will excuse him from the utmost scrutiny. He is a voluntary purchaser, and having notice of a fact which casts doubt upon the validity of his title, are the rights of innocent persons to be prejudiced through his negligence?

The will of Hockaday was proved the 11th day of July, 1799, before the County Court of New Kent, in Virginia, and recorded in the proper records of that county. When the defendant purchased the title he knew that it originated in Virginia, had been sanctioned by the executive council of that state, and that the warrant had been issued by the Register at Richmond. These are matters of public law, and are consequently known to all. But, independently of this, every purchaser of a military title cannot but have a general knowledge of its history.

Why was not the defendant bound to search for the will? The answer given is, the distance was too great, and the place where the will could be found was not stated on the warrant, or on any of the other papers. That mere distance shall excuse inquiry in such a case, would be a new principle in the law of notice.

The certificate of the original right, and the warrant, were ob-

tained in Richmond, Virginia. And in the office records and papers of the executive council, or in those of the register in Richmond, a copy of the will, probably, could have been found. And if such a search had been fruitless, it is certain that it could have been found on the public records of wills of New Kent county. A search short of this, would not lay the foundation for parol evidence of the contents of a written instrument. And shall a purchaser make a bad title good, by neglecting or refusing to use the same amount of vigilance?

In the case of Reeder et al. v. Barr et al., 4 Ohio Rep. 458, the Supreme Court of Ohio held, that where a patent was issued to Newell, as assignee of the administrator of Henson Reeder, deceased, it was sufficient to charge a subsequent purchaser with notice of the equitable rights of the heirs of Reeder.

It is difficult to draw a distinction, in principle, between that case and the one under consideration. An administrator in Ohio has no power, unless authorized by the Court of Common Pleas, to sell or convey an interest in land; nor has an executor in Virginia any power over the realty, unless it be given to him in the will. In this case, therefore, the purchaser was as much bound to look into the will for the authority of the executor, as the Ohio purchaser was bound to look into the proceedings of the Court for the authority of the administrator.

The case of the lessee of Willis v. Bucher, 2 Binn. 455, is also in point. The defendant derived his title from William Willis, to whom a patent had issued, reciting that the title was derived under the will of Henry Willis. This will did not authorize the sale of the premises, and the Court held that this was notice to the defendant.

So in the case of Jackson ex dem. Livingston v. Neely, 10 John. Rep. 374, it was held, that where a deed recited a letter of attorney, by virtue of which the conveyance was made, which was duly deposited with the clerk of Albany, according to the act of the 8th January, 1794, it was held to be sufficient notice of the power by means of the recital, to a subsequent purchaser, who was equally affected by it, as if the power itself had been deposited.

An agent receiving notes from an executor, payable to him as executor, as security for advances by the principal to the executor

on his private account, and not as executor, affects his principal with notice that it is a dealing with an executor with the assets for a purpose foreign to the trusts he was to discharge. 2 Ball and Beat. 491.

When a purchaser cannot make out his title but through a deed which leads to a fact, he will be affected with notice of that fact.   Mertins *v.* Jolliffe, Amb. 311.

A. made a conveyance to B., with a power of revocation by will, and limited other uses.   If A. dispose to a purchaser by will, a subsequent purchaser is intended to have notice of the will as well as of the power to revoke; and this is a notice in law.   And so in all cases where a purchaser cannot make out a title, but by deed which leads to another fact, notice of which a purchaser shall be presumed cognisant; for it is crassa negligentia, that he sought not after it.   Moore *v.* Bennet, 2 Ch. Ca. 246.

Notice of letters patent, in which there was a trust for creditors, is sufficient notice of the trust.   Dunch *v.* Kent, 1 Vern. 319.

That which shall be sufficient to put the party upon inquiry, is notice.   13 Ves. 120.

On a full consideration of this part of the case, we think that the defendant must be held to be a purchaser with notice.

The Circuit Court considered the defendant as vested with a right to such part of the land as is usually given to a locator, and directed one-fourth of the two tracts to be laid off to him so as to include his improvements; and they also decreed to the defendant three-fourths of the taxes paid by him, with interest. This part of the decree is equitable; and as we coincide with the views of the Circuit Court on all the points of the case, the decree is affirmed.