# McGILL v. McGILL.

Receipts of receivers of public moneys of the United States for the price of public lands, are sufficient evidence of title from the government to form the basis of a petitory action, in which the property itself may be recovered. *Per Curiam :* Lands held under such instruments enter into the domain of private property, and as such are subject to contracts, and, when there is no reservation by Congress, are liable to taxation.

A patent from the United States is conclusive evidence of the divestiture of the fee in the land, which remained in the United States notwithstanding the sale made by its officers and the receipt of the price ; but it does not affect any right to the land which may have existed under contracts between the patentee and third persons. The patent, to whomsoever issued, inures to the benefit of him to whom the patentee is bound to convey the legal title.

A patent for public lands fraudulently obtained, or illegally issued, is void.

A purchaser at a probate sale, of lands held by the deceased under an act of sale from an assignee of the receipts given by the receiver of public moneys for the original price of the land made *sous seing privé* and never registered, who has been for several years in actual notorious possession under a recorded title, cannot be affected by one claiming under a subsequent purchase of the land from the party by whom the price was paid to the government, and to whom the patent had been issued. The last purchaser, being the assignee of the party by whom the receipts had been previously assigned, cannot take advantage of the defect of registry and is bound by the act *sous seing privé.* C. C. 2417, 3522, § 5. *Per Curiam :* A purchaser will be charged with notice who buys, in the face of a notorious adverse possession, under a recorded title, for several years, from one who holds merely the legal title—the patent, which inures to the benefit of the equitable owner, without possession or apparent ownership.

Although acts under private signature do not of themselves prove the date of their execution against third persons, their date may be established by other evidence besides the actual proof of the time of their execution. Any circumstances which renders the ante-dating of the act impossible will give effect to its date.

APPEAL from the District Court of Tensas, *Selby*, J. *Shaw*, *Prentiss* and *Finney*, for the plaintiff. *Stacy* and *Sparrow*, for the warrantor appellant. The judgment of the court *(Slidell*, J. not sitting,) was pronounced by

McGILL
*v.*
McGILL.

EUSTIS, C. J. This is a petitory action for the recovery of a certain tract of land situated in the parish of Tensas, in the possession of the defendant *Penelope McGill*. The defence was made by *Edward Sparrow*, the curator of the succession of *Ducker*, deceased, from whom *Penelope McGill* purchased, and who was cited in warranty to defend the suit. The plaintiff had judgment in the District Court, and the curator has appealed.

*Washington* purchased the land in 1833 from the government, and took the usual duplicate receipts for the price paid from the United States receiver. Patents for the land were not issued until the 15th June, 1837; they were in his name, and appear to have been received by him. On the 26th of December, 1842, a sale of this land was made from *Washington* to the plaintiff by public act passed in the parish of Concordia, for the consideration of $2,200, which the vendor acknowledges to have received.

It is contended that a legal title to the land has thus been made out in the plaintaiff, which must prevail unless a better title is established to be in the defendant, or unless it be shown that the plaintiff's title is fraudulent. The burthen of establishing both these propositions is assumed by the warrantor, who defends the suit. *Sparrow*, the curator, alleges a valid and superior title to the land as against the plaintiff to have been vested in the succession of *Ducker*, and that the purchase of the title of *Washington* was the result of a fraudulent combination between the plaintiff, who is the son of the defendant *Penelope McGill*, the mother, the other defendant who is her brother-in-law, and *Washington*, the object of which was to effect an eviction of said *Penelope McGill* from the land, and thereby relieve her from the payment of the price of the land for which she was then sued.

We will examine the title under which the defendant holds the land under her purchase from the succession of *Ducker*, in 1838, conceding the proposition of the plaintiff's counsel as to the effect to be given to his title, subject to the contingency stated.

*Penelope McGill*, the person in possession, purchased the land on the 22d June, 1838, at the judicial sale of the effects of the succession of *John Ducker*. It was adjudicated at the price of $51 50 per acre, amounting to $23,175, payable in one, two, three and four years. The *procès-verbal* of the sale describes the land as the same tract purchased by said *Ducker* of *Jeremiah B. Warren*, containing four hundred and fifty acres more or less, &c., and refers to the inventory for a particular description. In the inventory the land in controversy, which consists of several parcels, is described under the general denomination of lots of land entered by *Dr. H. F. Washington* containing four hundred and fifty acres. In the mortgage given by the purchaser to secure the notes given in accordance with the conditions of the adjudication, the land is again described in the same manner as in the *procès-verbal*. The inventory and *procès-verbal* were duly recorded. There is no question as to the identity of the land, nor of *Ducker's*, nor the defendant's possession.

A writing under private signature, having the scrawl of a seal, bearing date, Rodney, August 1st, 1834, signed by *J. B. Warren*, and bearing the signature of two witnesses, is produced in evidence on the part of the warrantors. It purports that *J. B. Warren* hath, on that day, bargained and sold to *John Ducker* the land in controversy on the banks of the Mississippi, describing it by one of

McGILL
*v.*
McGILL.

its lateral boundaries, and as entered by *H. F. Washington* and sold by *Washington* to him, for and in consideration of three notes of $3,000 each, payable in one, two and three years; and that when the above notes were paid, he, *Warren*, was bound to make *Ducker* a full and sufficient title to the land. The execution of this instrument, at the time and place it bears date, is proved by the testimony of one of the subscribing witnesses.

*Warren*, who resided in the State of Mississippi, died in 1845 or 1846, and, subsequently to October, 1847, among his papers were found three receipts of the United States receiver for the purchase money of the several lots of land sued for, from *Washington*, each of them having an assignment written on it to *John B. Warren*, all dated the 9th September, 1834, and bearing the signature of *H. F. Washington;* and with them was found an instrument of the same date and bearing his signature, acknowledging to have received from *Warren* certain notes of his for and in full consideration of the following lots, describing those which are the subject of the present suit; and adding, "the receipts for which above described lots I have this day endorsed over to *J. B. Warren.*" This receipt included other transactions between them, which it is not material to notice. One of the subscribing witnesses to the first document was examined under a commission, and the interrogatory was put to him, from whom and when did *Warren* purchase the tract of land specified in said deed; and the answer was, that "he bought it from *Dr. Washington.* I think, in *June, or July,* 1834." *Washington* no longer resides in the State of Mississippi, and his place of abode in 1842, is given as in Christian county, Kentucky. The foregoing facts appear to constitute the defence of the title under which the land is held by *Penelope McGill.*

Before considering the objections made by the counsel for the plaintiff to the validity of the defendant's title, his relation towards it must be first ascertained. He bought of *Washington*, in 1842, the defendant *Penelope McGill* being in possession, under title from the succession of *Ducker*, since 1838. The plaintiff is the son of *Penelope McGill*, and resided with her in 1842. Her place of residence was in the State of Mississippi, about eight miles from her plantation in Louisiana. For two or three years back the plaintiff has had charge of his mothers's business, and must have known that the tract of land in dispute had been in her possession since 1838, as it was in cultivation and formed a portion of her plantation establishment.

From these facts the conclusion is forced upon us that, the interest of the son and mother were one and the same, and any other inference would be in conflict with the ordinary motives which influence human conduct. The purchase of *Washington's* title, if the object was not a fraud on his mother, was to defeat the claim of *Ducker's* succession for the purchase money of the land, by establishing a legal ground for witholding payment in an eviction under an outstanding title.

The points made in argument by the counsel for the plaintiff are: 1st, that no title is shown to have been in the succession of *Ducker*, and, if such title where shown, it would be null and void as to the plaintiff for want of registry, it consisting of writings under private signature and not recorded; 2d, that the plaintiff had no actual notice of any title in the defendant derived from his vendor *Washington*, and that the possession of the land by his mother did not charge him with notice, actual or constructive, of any derivation of title from *Washington;* 3d, that the *procès-verbal* and record of the sale from *Ducker's* succession did not constitute such notice, nor describe the lands sufficiently to identify them as

these sold by *Washington* to the plaintiff; and *lastly*, that there is no proof of  
any fraud or collusion between the plaintiff and the defendant.

Before considering the proposition of the counsel concerning the writings un-
der private signature under which *Ducker* possessed the land, and the effect of
their not having been recorded, it is necessary to ascertain what title the plaintiff
acquired by his purchase from *Washington*, and its validity and effect when in
the hands of *Washington* before the transfer to the plaintiff.

The plaintiff claims the land in dispute by patents regularly emanating from
the government of the United States. In the disposition of the public lands be-
longing to the United States, Congress has the sole power to regulate the form
and effect of titles to be issued to the purchasers, and the jurisprudence of the
courts of the United States has defined and settled their character beyond al[l]
controversy of which a brief reference to several leading cases will give the
outline. The documents before us are land receipts and patents, and it is not
necessary to extend the enquiry beyond them.

We have seen that *Warren* was in possession of three duplicate land office re-
ceipts which had on each a written assignment from *Washington*, in whose favor
they were given, bearing date September 9th, 1834. It has always been held in
this State that the receipts of the receivers of public moneys for public lands
were sufficient evidence of title from the government to form the basis of a pe-
titory action in which the property itself could be recovered, and this class of
suits has been frequently maintained on such instruments. *Lett et al.* v. *Prud-
homme et al.*, 3 Rob. 295. *Guidry* v. *Woods*, 19 La. 338. True it is that by
the legislation of the United States the patent is the superior and conclusive evi-
dence of the legal title to lands emanating from the government, and until it is
issued the fee of the land is considered as being in the goverment, but this con-
stitutes no objection to the recognition by courts of any other evidence of title
from the government as a sufficient ground for recovery in an action for the land.
*Bagnell et al.* v. *Broderick*, 13 Peters, 436.

The land office receipts, signed by the receiver of public moneys at Ouachita,
we are bound to consider as evidence of a purchase of the land from the govern-
ment of the United States, by *Washington*. They contain a description of the
object sold, the rate, $1 25 per acre, and an acknowledgment of receiving the
aggregate sum mentioned for the number of acres contained in the lots described.
Lands held under such instruments enter into the domain of private property
and as such are subject to contracts, and, where there is no reservation by legisla-
tion of Congress, as is the case as to some of the States, they are liable to taxa-
tion. The retention of the fee of the land in the United States is considered as
being no obstacle. *Carrol* v. *Safford*, 3 Howard, 461.

We understand the regular course to be observed by the officers of the United
States in the private sale of lands to be, that the application for purchase being
made to the register, he endorses a certificate on such application, which is
taken to the receiver, who is to receive the payment. When the purchaser pays
his money, the receiver to whom payment is made issues duplicate receipts, one
of which is given to the register who enters the sale on his books, the other is
given to the purchaser as evidence of his right. The register makes returns of
sales to the general land office accompanied by the receipts of the receivers thus
given to him together with his own certificates of purchase, on which patents are
issued and forwarded to the register to be distributed among the purchasers, *who
are to surrender the receipts thus held on receiving the patents*. The patents are

McGILL
v.
McGILL.

issued under the seal of the general land office, and duplicates of them are there preserved. Land Laws, 11, Edition of 1828. *Carrol* v. *Safford, loc. cit.*

Accordingly the patents in this case recite that *Washington* had deposited in the general land office a certificate of the register of the land office, whereby it appeared that full payment had been made by him for the land described, in consideration of which the land purchased by said *Washington* is granted, &c.

The patents being thus issued in the names of the purchasers, and we presume it is always the case unless there is evidence in the general land office of some other right to it, it follows that the patent is not necessarily in favor of the person to whom the land belongs. The purchaser may have died or parted with his title, and though it may have been merely an equitable one, it is not the less valid, nor are courts less bound to give it effect. The patent then is conclusive evidence of the divestiture of the fee in the land which remained in the United States, which it reserved, notwithstanding the sale made by its officers and the receipt of the price; but we do not understand it as affecting any right to the land which may have existed under contracts between the patentee and third persons. Our courts have always recognized the superior dignity and effect which the law and jurisprudence of the United States have attached to patents for lands issued under their authority, at the same time that they have given effect to the certificates of purchase and land office receipts, considering that they were proper evidences of title—though that title, under *that* jurisprudence, was held merely to be an equitable one. And it is always considered that the patent to whomsoever issued inures to the benefit of him to whom the patentee would be bound to make conveyance of the legal title. The fee being in the United States is merely technically so at law, but not in equity. *Carrol* v. *Safford, loc. cit.* And it has been, we believe, uniformly decided that when an equitable right originating before the date of the patent is asserted, the patent is no obstacle to its being examined in a court of equity. *Bush* v. *Ware et al.*, 15 Peters, 93, and cases there cited.

If a patent be fraudulently obtained, or has been issued against law, it is void. It would be a most dangerous doctrine to hold that in either of those cases a patent should vest the legal title. *Stoddard et al.* v. *Chambers*, 2 Howard, 318.

The patent in this case, according to the routine of the general land office, would have issued in favor of *Washington*, and have been forwarded to the register of the land office in Ouachita, to be delivered on the surrender of the receipts. These receipts were no longer in the possession of *Washington*; he had parted with them, and consequently had no right to the patents, nor could he have obtained them according to the general instructions given to the receiver, unless on proof of their loss, or satisfactory evidence that the land had not been transferred by him. We have before us the usual advertizement of the register of this district, giving notice to the purchasers of public lands of the receipt of a number of patents, and that they will be delivered on the presentation of the receiver's receipts of corresponding numbers. It would be a very serious question, as to whether *Washington* gained any rights by obtaining the patents after he had parted with the receipts, but we prefer determining the case, as this objection was not raised in argument, on the grounds on which the discussion at bar has principally turned.

In support of the proposition that, if the title of *Ducker* consisted of the acts under private signature from *Warren*, and from *Washington* to the latter, the title is void for want of registry, the counsel relies upon article 2417 of the Code, which provides that the sale of any immovable or slaves, made under private signature, shall have effect against the creditors of the parties and against third

persons in general only from the day such act was registered in the office of a notary and the actual delivery of the thing sold took place. Registry and delivery are thus both requisite to give effect to sales against creditors and third persons in general. But the article has this proviso, that this defect of registry shall not be pleaded between the parties who shall have contracted in such act, their heirs, and assigns, who are as effectually bound by a sale made under private signature' as if it were an authentic act. If, therefore, the plaintiff is the assign or assignee of *Washington*, the defect of registry cannot be taken advantage of by him, and he is bound by the act under private signature. The Code has not left the meaning of the word to conjecture, and under article 3522, which provides that, whenever the terms of law employed in the Code have not been particularly defined therein they shall be understood as defined in that article, it gives this definition to the word assigns, § 5: "Assigns means those to whom rights have been transmitted by a particular title, such as sale, donation, legacy, transfer, or cession." The defendant having bought the land in 1838, and being in possession under a title by public act in 1842, her possession being notorious, it seems obvious that the plaintiff, independent of his relation as son and forced heir of the defendant, could acquire nothing by purchase from *Washington* beyond his rights, and that the transfer-of *Washington's* title was a mere assignment of his rights in the sense of the definition. The defendant was the apparent owner of the land, *Washington* had no possession and could give none, and the transfer from him could not be a sale of the land, but was a mere assignment of his right in or to it.

In the case of *Splane, curator* v. *Micheltree*, 2 An. 265, it appeared that *Maxwell* being aware of the possession and ownership of a portion of a tract of land by the defendant, which he had purchased by an act under private signature from *Campbell*, and knowing that the act had not been recorded, bought the whole tract from *Campbell* by authentic act, which he had recorded in the parish where the land was situated before the registry of the defendant's title. He had stated that he had the advantage of the defendant, that the latter had neglected to have his sale recorded, and that he would start the next morning at day-light and have his sale first recorded. It was held that *Maxwell* having, at the time of his purchase, full knowledge of the ownership and possession of the defendant, whether derived from the records or any other source, could acquire no title to the prejudice of the defendant.

It had been previously held by this court, in the case of *Stockton* v. *Briscoe*, 1 Ann. 249, Mr. Justice *Slidell* dissenting, that one in possession of land purchased at a judicial sale of the effects of a succession cannot be affected by the fact, that the sale, by which the deceased acquired the land by act under private signature from a party then in possession, was never registered. The court considered that the object of the registry laws was to make apparent the ownership of property, and as the ownership of the land was manifested by a sufficient title and notorious possession, the party buying the title of the original owner, which had been transferred by an act under private signature to the deceased, at the sale of whose estate the defendant had purchased, could not recover the land from the defendant—in other words, that possession under a sale by public act duly recorded gave the purchaser of an outstanding title such notice as that he bought subject to the notice of adverse ownership, thus placing him in the attitude of an assign, and not a third person in the sense of the Code.

In both these cases the claim of the plaintiff was for part of land possessed by the defendant—in one for an undivided half, and in the other for a definite portion;

McGILL
v.
McGILL.

and the adverse possession was what the law defines as natural possession, not merely civil possession, and there could be no question as to its being actual notice and presumptive evidence of ownership.

The discussions which have taken place among civilians as to the meaning of the words *tiers* and *ayants-cause* under the Napoléon Code, and the difficulties which our courts have had in establishing any rule of universal application on their sense as used in our Codes, are familiar to the profession. Art. 3522, §§ 5, 32. They have admonished us of the caution necessary to be exercised in undertaking to lay down any general principles on this perplexed subject. In the cases we have decided, and in that under consideration, we concede that there are difficulties in the rule on which they are determined: but the antagonist doctrine appears to us to be not only impossible under our system in its operation, but immoral and subversive of all principles of common justice. In holding that actual notorious possession under a recorded title for several years is notice to all the world of ownership, we are not aware that any principle is asserted which is not in harmony with the law itself as well as with public policy.

The entry of land by purchasers at the land office is not only a public act, but in all new settlements the entry is not only a matter of notoriety but the land frequently takes its name from the person making the entry. The facility given to the transfer of the rights of the purchaser by the assignment of the land receipts has rendered very common the use of acts under *private signature* in the sale of lands purchased from the United States, as the records of our courts abundantly testify. In charging a purchaser with notice, who buys in the face of a notorious adverse possession under a recorded title for several years, from a person who holds merely the legal title—the patent which inures to the benefit of the equitable owner—without possession or apparent ownership, the facilities for speculation in titles may be abridged, but the interests of *bonâ fide* purchasers and of property itself will be subserved and protected. The apparent adverse ownership is, according to every fair presumption, under the entry, and of itself is sufficient to put any prudent man, who treats with a person out of possession, upon his guard against the title he is about purchasing.

To enable a man who has sold a thing once to turn round, and, with the price in his pocket, to sell the same thing to another who knows of the first sale, is to encourage iniquity and give effect to fraud. When the second purchaser is *without notice*, and the consideration of his purchase is what the law holds to be valuable, as he is not a participator in the fraud, he is maintained in his legal rights, and equity will give no assistance against him, for he has done nothing against equity or good conscience. "It is the notice of the use that is all the effect of the matter; for then he is *particeps criminis, et dolus et fraus nemini patrocinantur,* since in conscience he purchased my lands or my goods. For the common law whenever it found a consideration discharged the covin, but chancery looks further to the corrupt conscience of the party that will trafic for what in equity he knows to belong to another." Fonblanque's Equity, 151.

Conceding, however, that the title of *Washington* could be acquired by purchase adversly to the defendant in possession under a title, it is clear that nothing more than his rights were bought by the plaintiff. Considering the latter in the place and stead of *Washington,* the original owner, it remains to be ascertained what rights he has to the land in dispute against the defendant.

If we examine the validity of the acts under private signature on the grounds presented by the counsel for the plaintiff, we think the objections taken to their effect will be found to be untenable, whatever force they might have if taken in

favor of a *bonâ fide* purchaser without notice. It is said that these acts, being
mere private writings, have no date against the plaintiff until their date is proved
*aliunde.* But *Washington* in his receipt, and in the assignments of the land re-
ceipts to *Warren*, is a party to them, and in addition to article 2417, which pro-
vides that the parties to acts under private signature, their heirs, and assigns are
as effectually bound by such acts as if they were in authentic form, article 2239
gives to acts under private signature, acknowledged by the party against whom
they are adduced, between the parties who have subscribed it, their heirs and
assigns, the same credit as an authentic act. Although writings of this class un-
der private signature do not themselves make proof of the date of their execu-
tion against third persons, yet their date may be established by other evidence
besides the actual proof of the time when they were executed. Pothier gives
an example, where the contents of a private writing are mentioned in acts drawn
by public officers, such as *procès-verbaux* of affixing the seals or inventories.
Treatise on Obligations, § 715. This example, of the decease of the party, given
by Pothier, is not exclusive, and any circumstance which renders the ante-dating
of the writing impossible has been considered as giving effect to the date of the
instrument, under the rigid system of evidence established by the Napoléon
Code. 8 Toullier, 241. In the inventory of the *Ducker's* succession, made in
1838, and referred to in the *procès-verbal* of the sale, we find the land described
as three lots of land lying on the bank of the Mississippi river adjoining *Daniel
M. Bondurant*, entered by *H. F. Washington*, &c.

The testimony of *Woodruff*, though indefinite by itself, points to the same
conclusion, that the acknowledgment of *Washington* and the assignments of the
land receipts found among *Warren's* papers after his decease, were genuine, and
not ante-dated; and, we think, the evidence is conclusive against any right of
*Washington* to claim the land in controversy. The document having the signa-
ture of *Washington* is, as we conceive, proof of a sale having been made to
*Warren*, and its date, being subsequent to the sale from *Warren* to *Ducker*, is
not material, as giving *Washington* any right adversely to the present defend-
ant.

The writing under private signature from *Warren* to *Ducker*, bearing date
August 1, 1834, is proved to have been executed at the time it bears date by one
of the subscribing witnesses. Whether it conveyed the legal title to the land or
an equitable title only, it is not material to enquire. The plaintiff claims in the
right of *Washington*, and has no right to contest the title of the defendant under
this contract between *Warren* and *Ducker*, as it stands executed between their
heirs.

Considering, therefore, that the plaintiff, having due notice and actually know-
ing that the land in dispute belonged of right to the defendant, his mother, though
technically the legal title was in the United States, she having been for several
years previously in notorious possession thereof under a recorded title, if the
purchase from *Washington* was not a piece of fraud and collusion between
them, the only rights which the plaintiff could acquire being those of *Washing-
ton*, of whom he thereby became the assign, and *Washington* having no right
whatever to the land in dispute, our judgment must be for the defendant.

The judgment of the District Court is, therefore, reversed, and judgment ren-
dered for the defendant, with costs.