148 So. 690

**REID v. PHILLIPS.**

No. 31744.

May 1, 1933.

Rehearing Denied May 29, 1933.

John A. Woodville, of New Orleans, for appellant.

Wisdom & Sokolsky, Saul Sokolsky, and William Donnaud, all of New Orleans, for appellees.

ROGERS, Justice.

This is an appeal from an adverse judgment by William Reid, plaintiff in a petitory action against Johanna Phillips and her warrantor, the Liners Harvest Home.

The record discloses that on November 26, 1929, the Liners Harvest Home conveyed to William Reid by notarial act the property described in plaintiff's petition. About six months after the purported sale, Reid brought this suit against Johanna Phillips, who was in actual possession of the property. The defendant answered the suit, denying plaintiff's ownership and averring that the Liners Harvest Home, for whom she possessed, was the owner of the property. De-

fendant then called the Liners Harvest Home in warranty.

The Liners Harvest Home is an association composed of negroes, and its purpose is to extend relief to aged indigent members of the negro race. William Reid was the president of the Liners Harvest Home, and also the pastor of the King Solomon Baptist Church, the name under which the Liners Harvest Home operates as a church.

In response to the call in warranty by Johanna Phillips, the Liners Harvest Home filed an answer, in which it admitted that Johanna Phillips was in possession for its account of the property in dispute, and denied that Reid was the owner of the property, alleging that the conveyance to him was null because of fraud and misrepresentation.

The Liners Harvest Home specifically set forth that William Reid, who at the time of the purported act of sale, and for about two years prior thereto, was pastor of the respondent's congregation, maliciously and fraudulently and taking advantage of the faith, trust, and confidential relationship existing between him, a minister of the gospel, and his congregation, represented to the congregation that he desired to construct a new church upon one of the two adjacent lots of ground in dispute; and did falsely, fraudulently, and maliciously represent that as long as the property stood in the name of the Liners Harvest Home, the said Home could not obtain a loan with the property as security, and in order to obtain funds with which to erect the church in question, it was necessary to have the title in his name so that he might with the money secured from the loan erect the church. That the congregation hav-

ing implicit faith and confidence in said Reid, by resolution passed on July 26, 1929, instructed its attorneys to transfer to Reid the property in dispute herein.

That upon being informed of the intention of the Liners Harvest Home to transfer its property to Reid, its pastor, for the purpose hereinabove set forth, the attorneys for the congregation advised that the proper method of transferring the property for the intended purpose was by means of an act of sale to Reid, with a counter letter from Reid, explaining the nature of the transaction. That, accordingly, on August 13, 1929, the property was conveyed to Reid by a notarial act, and Reid, in his turn, executed a counter letter in favor of his purported vendor. This transfer to Reid was made for a recited consideration of "One dollar and other consideration."

The Liners Harvest Home further alleged that Reid, evidently realizing that he could not appropriate the property under this transaction, called a meeting at the said Home on or about October 21, 1929, into which he fraudulently and knowingly introduced persons other than members in the said church in order to fraudulently and illegally constitute a quorum for the purpose of carrying out his illegal and fraudulent designs, among those present being nine persons, whose names are set forth, who were not and never have been members of the said Home, and many of Reid's close relatives.

That at said fraudulent and illegal meeting, the said Reid, again taking advantage of the faith, trust, and confidential relationship existing between him as a minister of the

gospel and his congregation, fraudulently stated to those present that it was necessary to place the property in his name in order to borrow the money necessary for the construction of a church, and that he was hampered in his negotiations for the loan and in the handling of the property because of the existence of the counter letter. That in order to properly handle the transaction it was necessary that he should have complete charge and control of the property and should have the title in his name.

That to show his good faith and interest in the Home he desired to purchase the property for the insignificant sum of $3,000, and he informed those present at the meeting that they could take his word as a minister of the gospel that he would erect the church, and immediately upon the repayment of the loan he would retransfer the property to respondent.

That the members of the congregation present at the meeting, misled by the misrepresentations and false statements of its pastor, together with the bogus members also present at the meeting, disregarded the objections of the Home's attorneys, and agreed to cancel the prior act of sale and accompanying counter letter, and to transfer the property to Reid for a purported consideration of $3,000. That resolutions to that effect were accordingly adopted; and the act of sale of November 26, 1929, under which plaintiff is asserting title herein, was executed under the circumstances and conditions described.

That at the execution of the sale, Reid gave one of the members of the committee a check for $3,000, supposedly representing the purchase price of the property, which check was void; Reid having no money on deposit in the bank to meet the check. That, as a matter of fact, respondent never received any consideration whatever for the property.

That Reid, immediately upon the execution of the act of sale, abandoned services at respondent's church, and under the persistent requests of members of respondent's congregation as to why the church was not erected, assumed the attitude that he had never intended to build the church, and he admitted, both verbally and in writing, that he would retransfer the property to the respondent Home when it repaid him the money expended by him in respondent's interest.

That up until the middle of February, 1929, Reid was willing to retransfer the property to the respondent for approximately $200, and the only dispute at that time was as to the amount due Reid; respondent claiming that Reid had expended an amount much less than that which he claimed.

That in the month of February, 1930, Reid demanded sums ranging from $2,000 to $3,000, instead of $200, all of which amounts were out of proportion to the expense which he had actually incurred.

That in law and in fact by reason of the fraud practiced by Reid, respondent's title to the property in dispute has never been legally divested.

The evidence adduced on the trial of the case amply supports the allegations of fact contained in the answer of the respondent Liners Harvest Home. It convincingly shows that Reid conceived and executed a scheme for obtaining title to respondent's property. Reid advised respondent's board of directors that the prospective lender would not ad-

vance money to a corporation, but only to an individual; and that as president of the Liners Harvest Home and pastor of its church, he was the proper person to obtain the loan and complete the church. He called the meeting into which he introduced many non-members, friends, and relatives, in order to constitute a quorum and effect his purpose. At this meeting some of the respondent's members, suspicious of his motives, protested, and Reid compelled them to leave. Those members who remained were lulled into security by Reid's representations that the transaction would be simply a "say-sale," namely, "you say you sell the place to me 'for $3,000." Accepting Reid's word as their pastor and a minister of the gospel that he would obtain the desired loan and retransfer the property, they authorized the transaction.

The record is clear that no consideration for the transfer of the property passed between Reid and the Liners Harvest Home. The check given to represent the purchase price was immediately returned to Reid and destroyed by him. Reid was never placed in possession of the property, and he made no attempt to obtain possession thereof or to exercise any rights of ownership therein until about a month before filing this suit.

A number of witnesses, including the attorneys who handled the transaction, testified that Reid admitted on several occasions that he had given no consideration for the sale and that he was not the owner of the property. Reid offered to retransfer the property if he was reimbursed his alleged expenses for account of the respondent home. One of his witnesses, a real estate agent, testified that Reid called at his office and ex-

pressed his willingness to retransfer the property to Johanna Phillips for the Home if he was paid "$100 cash for clearing up title." The witness also testified that Reid· made the same statement in his presence to one of respondent's attorneys. Another of respondent's attorneys testified that Reid stated to him there was so much discontent and bickering among respondent's members that if he were paid the money he had expended for respondent he would retransfer the property to respondent. Reid told this witness that his expenses amounted to $58. And it is also in evidence that Reid signed a written offer to reconvey the property to the Liners Harvest Home for a consideration of $200. Manifestly, if the transaction were bona fide, and Reid had paid $3,000 for the property, as recited in the act of sale, he would not have been willing a few months after its acquisition to reconvey the property to his vendor for one-fifteenth of the amount of the purchase price.

The plaintiff, Reid, strenuously contends that the act of sale whereby he allegedly acquired title ·to the property in dispute cannot be attacked and annulled by parol evidence. We find no error in the ruling of the court below refusing to exclude such evidence in this case.

Plaintiff, in support of his contention, cites four decisions of this court, holding that the verity and reality of the sale of an immovable can be attacked by the parties thereto only in two ways, namely, by means of a counter letter and by answers to interrogatories on facts and articles. The four cases relied on by plaintiff are Delery v. Bunle, 1 Mart. (N. S.) 451; Anderson v. Benham, 40

La. Ann. 336, 4 So. 454; Godwin v. Neustadtl, 42 La. Ann. 735, 7 So. 744; and Font v. Land and Improvement Co., 47 La. Ann. 272, 16 So. 828.

These cases, however, are not appropriate to the state of facts disclosed in the present case. The legal principle announced by them is that in the absence of fraud only two kinds of evidence are admissible in attacking an authentic act—a counter letter and interrogatories on facts and articles. In none of the cases was fraud alleged. This is clearly pointed out in Le Bleu v. Savoie, 109 La. 680, 33 So. 729, 730, where the court, in commenting upon the leading case of Godwin v. Neustadtl, said: "In the cases of Godwin v. Neustadtl, 42 La. Ann. 735, 7 So. 744, and Rush v. Landers, 107 La. 549, 32 So. 95, 57 L. R. A. 353, and in many other similar cases, where the parol evidence was excluded, the reason of the exclusion was not that interrogatories had been propounded the answers to which could not be contradicted, but that the cases were not such as to admit of parol evidence. They were cases where, no fraud or error being alleged, parol was offered for the purpose of contradicting written acts or affecting title to real estate."

The rule of law governing this case is set forth in Locascio v. First State Bank & Trust. Co., 168 La. 723, 123 So. 304, 305, viz.: "It is the unbroken rule that authentic sales cannot be attacked, except by means of a counter letter, or by interrogatories on facts and articles, *or by allegation and proof of fraud or error.*" (Writer's italics.) That is to say, the rule of exclusion of parol evidence as applied to all written acts must always yield to allegations of fraud and misrepresentation. See Le Bleu v. Savoie, supra.

The case of Logan v. Walker, 152 La. 880, 94 So. 430, is strikingly similar to the instant case. There an ignorant negress of weak intellect was induced to sign a notarial act conveying one-half of her interest in an oil lease on the representation that "she would never get anything out of it unless she signed this act." The notary, as did the attorneys in this case, endeavored unsuccessfully to explain the nature and effect of the instrument. No consideration was given and received. The court permitted the introduction of parol evidence and annulled the sale for fraud. The court, in the course of its opinion, said: "Hence we think that the acknowledgment of payment in the act, which act is shown to be fraudulent, is of no value, under the evidence in this case. It is true that the parol evidence offered to show nonpayment was objected to on the ground that the receipt in the sale controls. If the sale had been attacked by plaintiff on the ground that it was null, because the consideration had not been paid, doubtless the parol evidence offered would not have been admissible to prove the allegation. C. C. art. 2237; Forest v. Shores, 11 La. 416. But in an attack on the sale to annul it by the vendor on the ground that she is ignorant and of weak mind, and has been imposed upon by the vendee by false and fraudulent representations made to her to induce her to sign it, we see no reason why the fact that no consideration was paid cannot be shown by parol evidence, and otherwise than by a counter letter or answers by the vendee to interrogatories on facts and articles, when

the purpose is to show the fact as a mere circumstance to prove the fraud and imposition alleged, and as corroborative of the other evidence in the case."

For the reasons assigned, the judgment appealed from is affirmed.