Patrick A. McKENNA, Appellant,

v.

Floyd A. WALLIS and Pan American
Petroleum Corporation, Appellees.

PAN AMERICAN PETROLEUM CORPO-
RATION, Appellant,

v.

Floyd A. WALLIS, Appellee.

No. 19631.

United States Court of Appeals
Fifth Circuit.

Jan. 21, 1964.

Rehearing Denied April 20, 1965.

Wisdom, Circuit Judge, dissented.

See also 5 Cir., 303 F.2d 778.

E. L. Brunini, Jackson, Miss., Courtney Whitney, Jr., Washington, D. C., G. P. Hewes, III, Brunini, Everett, Grantham & Quin, Jackson, Miss., for Patrick A. McKenna.

Mettery I. Sherry, Jr., Percy Sandel, Lloyd J. Cobb, New Orleans, La., William P. Hardeman, Houston, Tex., Cobb & Wright, Joseph V. Ferguson, II, New Orleans, La., for Pan American Petroleum Corp.

C. Ellis Henican, New Orleans, La., H. M. Holder, Shreveport, La., for Floyd A. Wallis.

Before RIVES and WISDOM, Circuit Judges, and BOOTLE, District Judge.

RIVES, Circuit Judge.

These actions, involving common questions of law and fact, were consolidated in the district court and decided pursuant to an opinion reported at 200 F.Supp. 468. They involve rights asserted separately by Patrick A. McKenna and Pan American Petroleum Corporation in an oil and gas lease from the United States to Floyd A. Wallis covering 826.87 acres of exceedingly rich "mud lumps" at the mouth of the Mississippi River in Plaquemines Parish, Louisiana.

The lease was issued to Wallis on December 19, 1958, effective January 1, 1959. The lease was of public domain land, that is land in which title vested in the United States because of its sovereignty pursuant to the Mineral Leasing Act of 1920, now appearing as Title 30 U.S.C.A. § 181 et seq., as distinguished from acquired land, that is land which was once privately owned and then acquired by the United States, the leasing of which is pursuant to the Mineral Leasing Act for Acquired Lands of August 7, 1947, now appearing as Title 30 U.S. C.A. § 351 et seq.

The claims both of McKenna and of Pan American were based upon events occurring prior to the issuance of the lease to Wallis. McKenna claimed that Wallis and he were joint venturers in acquiring the lease, and that he was entitled to an undivided one-third interest in the lease. Pan American claimed that Wallis had entered into an agreement granting Pan American the option to acquire the lease thereafter issued to Wallis. The district court decided that neither McKenna nor Pan American acquired any interest in the lease upon what the court referred to as a very narrow issue, saying:

"The issue is very narrow under the Louisiana rule that all 'contracts applying to and affecting' 'oil, gas, and other mineral leases' must be reduced to writing. LSA–C.C. Arts. 2275, 2440, 2462, via LSA–R.S. 9:1105. Having failed to obtain new written agreements, each of the plaintiffs is compelled to rely on a single instrument. McKenna's claim is imprisoned in the letter agreement of December 27, 1954–January 3, 1955; Pan American's claim is confined to the language of the March 3, 1955 option. Except as it throws light on their original intent, the conduct of the parties after those dates is irrelevant. Any new understandings reached in 1956, 1957, 1958 or 1959 are unenforceable in the absence of a writing. Nor does it matter whether Wallis obtained his lease by breaching his trust, as alleged. If the claimants acquired an interest in the lease, it is under the written instruments, not by virtue of any subsequent estoppel."

McKenna v. Wallis, E.D.La.1961, 200 F.Supp. 468, 471, 472.

We think that the district court committed fundamental error in applying Louisiana statutes and law to determine rights in a lease on public domain land which were and are subject only to the sovereignty of the United States. The principle as to which law, state or federal, applies was stated long ago in Wil-

cox v. Jackson ex dem. McConnel, 1839, 38 U.S. (13 Peters) 498, 516, 10 L.Ed. 264:

> "We hold the true principle to be this, that whenever the question in any court, state or federal, is, whether a title to land which had once been the property of the United States has passed, that question must be resolved by the laws of the United States; but that whenever, according to those laws, the title shall have passed, then that property, like all other property in the state, is subject to the state legislation; so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States."

Subsequent decisions have made it clear that "title" as used in that principle includes not only the legal title, but also the equitable title, indeed, the entire bundle of rights going to make up ownership. Whether the lease from the United States to Wallis was in part for the benefit of McKenna or of Pan American or of both are questions to be determined by federal law.

Irvine v. Marshall, et al., 1858, 61 U.S. (20 How.) 558, 15 L.Ed. 994, requires the application of federal law until both legal and equitable titles have passed from the United States. The United States was not a party to that litigation, but the Court recognized in clear and unmistakable terms that the United States owed a duty, to be performed both through its General Land Office and through its federal courts, to see that the equitable title as well as the legal title to public lands was vested in the proper person who proved his right under the federal law. The opinion emphasized the doctrine of resulting trusts which may have application to the facts of this case:

> "With respect to resulting trusts, and the jurisdiction and duty of the courts of the United States to enforce them, the opinion of this court has been emphatically declared; and so declared in a case of peculiar force and appositeness, because it related to the acts of an agent in the entry and survey of lands, and is in its principal features essentially the same with the cause now under consideration. We allude to the case of Massie v. Watts, reported in the 6th vol. of Cranch, p. 143 [148, 3 L.Ed. 181]. This was a suit in equity in the Circuit Court of the United States for the district of Kentucky, to compel the conveyance of land from an agent to his principal, upon the ground that the agent had withdrawn an entry on lands made in the name of his principal, had caused an entry and survey to be made in his own name, and had thereby obtained a legal title to this land. In decreeing the relief sought by the complainant, this court, expounding the law by the Chief Justice (pp. 169, 170 [of 6 Cranch, 3 L.Ed. 181]), said: 'If Massie (i. e., the agent) really believed that the entry of O'Neal (his principal), as made, could not be surveyed, it was his duty to amend it, or to place it elsewhere. But if in this he was mistaken, it would be dangerous in the extreme—it would be a cover for fraud which could seldom be removed, if a locator alleging difficulties respecting a location might withdraw it, and take the land for himself. But Massie, the agent of O'Neal, has entered the land for himself, and obtained a patent in his own name. According to *the clearest and best-established principles of equity*, the agent who so acts becomes a *trustee* for his principal. He cannot hold the land under an entry for himself, otherwise *than as a trustee for his principal*.' This exposition of the equity powers of the courts of the United States as applicable to resulting trusts—a power inseparable from the cognizance over frauds, one great province of equity jurisprudence—is conclusive.

> "With respect to the power of the Federal Government to assert,

through the instrumentality of its appropriate organs, and administration of its constitutional rights and duties, and with regard to such an assertion as exemplified in the management and disposition of the public lands, and the titles thereto, the interpretation of this court has been settled too conclusively to admit of controversy." 20 How. at 565, 566, 61 U.S. at 565, 566, 15 L.Ed. 994.

■ The principles of law announced in repeated opinions of the Supreme Court seem to us clearly to lead to the conclusion that as to the original patent, lease or other grant from the United States, federal law controls in determining title in its broadest sense, including strictly legal title, trust rights and any and all equitable or beneficial interests. Gibson v. Chouteau, 1871, 80 U.S. (13 Wall.) 92, 101, 102, 20 L.Ed. 534; Sparks v. Pierce, 1885, 115 U.S. 408, 413, 6 S.Ct. 102, 29 L.Ed. 428; Van Brocklin v. State of Tennessee, 1886, 117 U.S. 151, 168, 6 S.Ct. 670, 29 L.Ed. 845; Widdicombe v. Childers, 1888, 124 U.S. 400, 405, 8 S.Ct. 517, 31 L.Ed. 427;[1] Felix v. Patrick, 1892, 145 U.S. 317, 328, 12 S.Ct. 862, 36 L.Ed. 719; United States v. Colorado Anthracite Co., 1912, 225 U.S. 219, 223, 32 S.Ct. 617, 56 L.Ed. 1063; Buchser v. Buchser, 1913, 231 U.S. 157, 161, 34 S.Ct. 46, 58 L.Ed. 166; Ruddy v. Rossi, 1918, 248 U.S. 104, 106, 107, 39 S.Ct. 46, 63 L.Ed. 148; see also other cases cited in 73 C.J.S. Public Lands § 209, and 42 Am.Jur., Public Lands, § 37.

Indeed the same principle was recognized by the Supreme Court of Louisiana in the early case of Kittridge v. Breaud, La., 1843, 4 Rob. 79, 39 Am.Dec. 512, as follows:

"And the principle is well recognized in our jurisprudence, as well as in that of the courts of the United States, that where an equitable right, which originated before the date of the patent, whether by the first entry or otherwise, is asserted, it may be examined into: Brush v. Ware, 15 Pet. 93 [10 L.Ed. 672]; Bouldin v. Massie, 7 Wheat. [122] 149 [5 L.Ed. 414]."

The Mineral Leasing Act itself makes clear that, as a part of the public policy of the United States directed at opposing the monopoly of federally-owned mineral deposits, the Bureau of Land Management must examine into the qualifications of the real lessee and of any assignee of a mineral lease or of a part interest. See sections 181 and 184 of 30 U.S.C.A. Those provisions leave no room for operation of any State law.

The same result must be reached if we follow through on the logical views expressed by the Director of the Bureau of Land Management of the United States Department of Interior in his decision sustaining Wallis' application to lease as public domain land the acreage here involved:

*"What Law Then is to Control?*

"It is said in United States v. Louisiana, supra [1949, 339 U.S. 669, 699, 70 S.Ct. 914, 94 L.Ed. 1216], and United States v. California, supra [1946, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889], that the resources in and under subaqueous soil of the sea are an incident to the paramount rights and power of the United States over the marginal sea; therefore, that power must be *paramount to any other power* in disposing of those resources. Since it was held that the United States had the paramount power over and Louisiana did not have title to the marginal sea, then Louisiana must not have had a basis for legislative jurisdic-

---

1. In that case, Widdicombe had got his patent but was held to be a purchaser in bad faith, the Court saying: "The holder of a legal title in bad faith must always yield to a superior equity. As against the United States his title may be good, but not as against one who had acquired a prior right from the United States in force when his purchase was made under which his patent issued. The patent vested him with the legal title, but it did not determine the equitable relations between him and third persons." 124 U.S. at 405, 8 S.Ct. at 519, 31 L.Ed. 427.

tion to dispose of the subaqueous soil or resources even though the United States may not have acted or entered the field. If Louisiana did not have the necessary contacts to establish a sufficient basis for legislative jurisdiction, how could any State real property law apply? The legislation and judicial decrees of a State can only apply to persons and things over which the State has jurisdiction. Gibson v. Chouteau, 13 Wall. 92, 99 [20 L.Ed. 534] (U.S. 1871).

"There is a strong presumption that any statute is to be construed *prima facie* territorial in effect. American Banana Co. v. United Fruit Co., 213 U.S. 347, 357 [29 S.Ct. 511, 53 L.Ed. 826] (1908). This lack of jurisdiction is based upon the proposition that a State does *not* have the power to deny the paramount authority of the United States over the marginal sea, United States v. Louisiana, supra; '(c) alifornia, like the thirteen original colonies, never acquired ownership in the marginal sea. * * *' Id., [339 U.S. p.] 704 [70 S.Ct. p. 916, 94 L.Ed. 1216]; this power, or rather lack of it, has no relation to the power of a State to use or regulate the marginal sea absent conflicting Federal policy, and the question is open so far as the power of a State to extend or establish its external territorial limits *vis a'vis* persons other than the United States or those acting on its behalf are concerned. Id., [339 U.S. p.] 705 [70 S.Ct. p. 917, 94 L.Ed. 1216]. Nothing is apposite in Manchester v. Massachusetts, 139 U.S. 240 [11 S.Ct. 559, 35 L.Ed. 159] (1891) (inland waters); The Abby Dodge, 223 U.S. 166 [32 S.Ct. 310, 56 L.Ed. 390] (1912); or Skiriotes v. Florida, 313 U.S. 69, 75 [61 S.Ct. 924, 85 L.Ed. 1193] (1940) (both cases involve power of a State over her citizens), for there is quite obviously a great difference between the exercise of police power, within or without the territorial boundaries of a State and the proprietary rights in land within those same boundaries. Utah Power & Light Co. v. United States, 243 U.S. 389, 404 [37 S.Ct. 387, 61 L.Ed. 791] (1914). The Department has taken the position that the boundary of the State of Louisiana prior to the date of the Submerged Lands Act of May 22, 1953 (67 Stat. 29; 43 U.S.C. §§ 1301–1315) was at the low water mark of the Gulf of Mexico and at that point marked by the separation of the inland waters from the open sea. Solicitor's Opinion, M–36239 (October 1, 1954). United States v. Louisiana, supra, implies this result. It is my opinion, based upon the above-cited authorities and analysis, that State real property law never applied to any of the subaqueous soil seaward of the inland waters within the former boundary of the State of Louisiana.

"Is State law controlling or applicable in grants and title questions involving public lands of the United States? It is a principle of law that a State cannot by legislative fiat decree a forfeiture of the public lands of the United States and proclaim title in herself. United States v. Oregon, 295 U.S. 1, 29 [55 S.Ct. 610, 79 L.Ed. 1267] (1934). This is based upon the rule that Federal questions cannot be ultimately decided by State tribunals. Brewer-Elliott Oil & Gas Co., et al. v. United States, et al., 260 U.S. 77, 87 [43 S.Ct. 60, 67 L.Ed. 140] (1922). Thus, the courts of the United States will construe the grants from the United States without reference to the rules of construction adopted by the States for their own grants. Packer v. Bird, 137 U.S. 661 [11 S.Ct. 210, 34 L.Ed. 819] (1891); Shively v. Bowlby, 152 U.S. 1, 44 [14 S.Ct. 548, 38 L.Ed. 331] (1893). United States v. Utah, 283 U.S. 64, 75 [51 S.Ct. 438, 75 L.Ed. 844]

(1930), states that '(s)tate laws cannot affect titles vested in the United States.' For example, the question of navigability is a Federal question, United States v. Utah, supra, [283 U.S. p.] 75 [51 S.Ct. p. 440, 75 L.Ed. 844]; consequently, when the United States is disposing of a portion of its public domain, State law can no more affect the original paramount title of the United States which involves construction of one of its grants than could a State court or legislature pronounce a stream navigable with binding effect which the courts of the United States found to be non-navigable. United States v. Oregon, supra, [295 U.S. p.] 29 [55 S.Ct. p. 621, 79 L.Ed. 1267]; Oklahoma v. Texas, 258 U.S. 574, 583, 591 [42 S.Ct. 406, 66 L.Ed. 771] (1922). While the 'public land' States possess certain jurisdictional police powers over public lands of the United States situated within the State's boundaries, McKelvey v. United States, 260 U.S. 253, 258 [353, 358, 43 S.Ct. 132, 67 L.Ed. 301] (1922), those States have no basis for jurisdiction to legislate or otherwise affect title paramount to the public lands of the United States, and State real property law could in nowise divest or delimit the rights and expectations of the United States in its public lands as known at common law which is the general law followed by the courts of the United States."

We would intimate no opinion as to who may ultimately be entitled to prevail in this litigation. In our opinion, the judgment should be vacated and the cause remanded for re-trial upon the evidence already taken and any additional relevant evidence, and for full and complete findings of fact and conclusions of law on all issues under the applicable principles of federal law.

Vacated and remanded.

WISDOM, Circuit Judge (dissenting).

I respectfully dissent.

In this case there is much to be said for drawing on the "federal common law" to determine the rights of the parties. After all, the parties claim under a lease from the United States. And, in the matter of equitable remedies, the law of the forum here differs importantly from the law of the rest of the States: the civil law does not recognize resulting trusts or constructive trusts, not at least as these great tools of justice are effectively used in other states to rectify the effects of bad faith.

But I can find no escape from the consequences of the fact that title to the lease in question passed from the United States to Wallis. See Hodgson v. Federal Oil & Development Co., 1927, 274 U.S. 15, 47 S.Ct. 502, 71 L.Ed. 901.

With due deference, it seems to me that Irvine v. Marshall does not compel an application of federal common law rather than the law of the forum. In that case no patent had yet issued to either the plaintiff or the defendant, and it was held that a state or territorial law could not be invoked to force the issuance of a certificate of title to one or the other of two competing parties. The Supreme Court recognized, however, that an entirely different rule would apply *once legal title had in fact passed from the United States:*

"We hold the true principle to be this: that whenever the question in any court, State or Federal, is whether a title to land which was once the property of the United States has passed, that question must be resolved by the laws of the United States; but that whenever, according to those laws, the title shall have passed, then the property, like all other property in the State, is subject to state legislation, so far as that legislation is consistent with the admission, that the title passed and vested according to the laws of the United States."

Here, the United States transferred all of its lease interest to Wallis. On December 19, 1958, the Department of the Interior issued a public domain lands

lease to Wallis over a prior applicant, Morgan, whose bids did not contain a sufficient description of the land. After appeals to the district court and Court of Appeals for the District of Columbia, Morgan's contentions were rejected and Wallis's right to the government lease became final. McKenna v. Seaton, 1958, 104 U.S.App.D.C. 50, 259 F.2d 780, cert. den'd 358 U.S. 835, 79 S.Ct. 57, 3 L.Ed. 2d 71; Morgan v. Udall, 1962, 113 U.S. App.D.C. 192, 306 F.2d 799, 801, cert. den'd 371 U.S. 941, 83 S.Ct. 320, 9 L.Ed. 2d 275.

The case before the Court concerns a mineral lease and not a patent, but Pan American Petroleum Corporation v. Pierson, 10 Cir. 1960, 284 F.2d 649, cert. den'd 366 U.S. 936, 81 S.Ct. 1661, 6 L.Ed. 2d 848, makes it clear that there is no distinction between a patentee and a lessee of a mineral lease, as far as passage of title to the mineral is concerned:

> "We deem it unnecessary to delve into the legal complexities as to whether an oil and gas lease grants a profit a prendre or creates an estate in land. Under the first theory the lessee gains title to the oil and gas after its severance and under the second the lessee has an ownership of the hydrocarbons in place. Under each theory the government, by the issuance of the lease, has performed the last act required of it to vest in the lessee the right to explore for, produce, market and sell the oil and gas underlying the leased premises."

Some of the decisions relied upon by the majority may be distinguished on the facts from this case. Thus, Widdicombe v. Childers, 1888, 124 U.S. 400, 8 S.Ct. 517, 31 L.Ed. 427 and similar cases are distinguishable in that the claimant "had acquired a prior right from the United States in force when his purchase was made under which his patent issued". There is no question here, as there was in United States v. Louisiana, 1949, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 and United States v. California, 1946, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889, of the paramount power of the United

States over the marginal sea. The issue is not one involving the State's assertion of jurisdiction. There is no interference here with any overriding national interest. As in Bank of America National Trust & Savings Association v. Parnell, 1956, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93, this litigation between private parties does not intrude upon national policy or the rights of the United States. When leasing its lands to individuals, unless there are special circumstances, the government acts in a proprietary capacity in the same way as does the private land owner. Camfield v. United States, 1897, 167 U.S. 518, 524, 17 S.Ct. 864, 42 L.Ed. 260.

If the law of the forum controls, as I think it does, although "the jurisprudence of this State has fluctuated in construing a mineral lease as being in essence a real right or a personal right, it has been consistent to the effect that the transfer of an interest in a mineral lease cannot be made the subject of a verbal agreement and cannot be proved by parol evidence." Hayes v. Muller, La.App. 1962, 146 So.2d 176, 179; certified to Supreme Court and affirmed. Louisiana law, therefore, does not allow McKenna to prove his claim to a one-third interest in the title to the lease or allow Pan American to go beyond the terms of the option agreement. Whatever rights McKenna may have to an accounting for the profits resulting from a joint venture (see Hayes v. Muller), or otherwise, he cannot prove title to an interest in the lease itself by parol evidence. And whatever rights Pan American may have for damages for Wallis's breach of covenant "to make diligent efforts" to accomplish the purpose of the option, the parol evidence rule bars a court enforced conveyance of a lease not covered by the option.

I would affirm the judgment of the district court, without prejudice to the plaintiffs' rights, if any, to bring new and different actions, not based on McKenna's claim to a one-third interest in the title to the lease and not based on Pan American's claim to specific performance of the option.

ON PETITIONS FOR REHEARING

RIVES, Circuit Judge:

All parties have petitioned for rehearing and the Court has received additional briefs. In our original opinion, this Court held, Judge Wisdom dissenting, that federal law should be applied to determine rights asserted separately by Patrick A. McKenna and Pan American Petroleum Corporation in an oil and gas lease from the United States to Floyd A. Wallis covering public domain land. The district court had decided that under Louisiana law neither McKenna nor Pan American acquired any interest in the lease. We vacated the judgment and remanded the cause "for re-trial upon the evidence already taken and any additional relevant evidence, and for full and complete findings of fact and conclusions of law on all issues under the applicable principles of federal law." Pan American has petitioned for a rehearing limited to the interpretation of its claimed option agreement with Wallis, and it requests this Court to find as a fact that Wallis breached his fiduciary relationship. McKenna limits his petition for a rehearing to a request for additional findings of a joint venture between Wallis and McKenna, that Wallis breached his fiduciary obligations to McKenna and that Wallis failed to prove fraud on the part of McKenna. Wallis challenges our holding that federal law governs the claims of McKenna and Pan American and our reliance upon Irvine v. Marshall, 61 U.S. (20 How.) 558, 15 L.Ed. 994 (1858).

As stated in our original opinion, the United States, acting through the Secretary of the Interior, issued an oil and gas lease of public domain land to Floyd A. Wallis pursuant to the Mineral Leasing Act of 1920, 30 U.S.C.A. § 181 et seq. We have concluded that our decision should be more closely tied to that Act.

It should be noted that the actions before the district court, and before this Court on appeal, do not seek to overturn the decision of the Secretary awarding the lease to Wallis. McKenna and Pan American were not applicants who competed with Wallis before the Secretary. Indeed, it is evident that McKenna and Pan American supported Wallis's claim to the Secretary that he was the first qualified applicant for the acreage in question and entitled to a lease. If these actions were those of "competing claimants," the Secretary's decision would be subject to judicial review only if it were shown that he had acted arbitrarily or unreasonably or that his interpretation of what constitutes "public lands" was erroneous as a matter of law. E. g., Morgan v. Udall, 1962, 113 U.S.App.D.C. 192, 306 F.2d 799.

We again deal with which law applies, and particularly with the contention that the Rules of Decision Act, 28 U.S.C. § 1652 (1958), requires that state law be applied to determine the claims of McKenna and Pan American to the oil and gas lease. It appears that the district court felt that the Rules of Decision Act compelled adherence to the local law. See 200 F.Supp. at 471–472, n. 13. And the Tenth Circuit has followed that view in a case involving a claim of "joint venture" highly similar to McKenna's claim here. Blackner v. McDermott, 10 Cir. 1949, 176 F.2d 498. That court held, *inter alia*, that

"* * * jurisdiction of the court resting upon diversity of citizenship, and the action not being one under federal law, the relationship of the parties each toward the other in respect of the leasehold estate must be determined by the law of Wyoming. Erie Railroad Co. v. Tompkins, 304 U.S. 64, [58 S.Ct. 817, 82 L.Ed. 1188], * * * Ruhlin v. New York Life Insurance Co., 304 U.S. 202 [58 S.Ct. 860, 82 L.Ed. 1290]. * * *"

176 F.2d at 500. Although the actions in the instant case were predicated upon diversity of citizenship, and although the action is not one under federal law in the sense that federal law did not create the right of action, it does not necessarily follow that the district court

was required to apply state law. The Rules of Decision Act[1] says nothing about the basis of jurisdiction. While it is true in the bulk of diversity cases the substantive issues are nonfederal and hence state substantive law is determinative, this is not always true.[2] The law applied should be keyed to the nature of the issue before the court; if nonfederal, state substantive law should be applied; if a federal matter is before the court, federal law should be applied.[3] Francis v. Southern Pacific Co., 1948, 333 U.S. 445, 68 S.Ct. 611, 92 L.Ed. 798, involved an action for the wrongful death of a railroad employee who was killed while riding on a free pass. Jurisdiction was predicated upon diversity of citizenship and the right of action was created by state law. Federal statutes provided extensive regulation of the giving of free passes by railroad; however, these statutes were silent as to the tort duties of a railroad to the recipient of a free pass. The Supreme Court held that federal law was to be applied and that state's tort law did not control. The "Erie doctrine" does not annul the federal courts' responsibility to develop federal common law in aid of the uniform implementation and protection of federal interests.[4]

■■ In summary, when jurisdiction of the federal courts is based on diversity of citizenship, all nonfederal matters will be decided by applying the law of the state in which the court is sitting while federal issues in such cases will be decided by reference to federal law. Where federal matters are involved, the specific language of valid federal statutes will control when applicable; where federal statutes do not clearly articulate the law to be applied, federal courts must fill the interstices; federal courts can do this by reference to federal or state law and the choice here depends on a number of different factors.[5] The first question presented in the instant case is whether or not "federal matters" are involved.[6]

■ Prior to 1920, lands of the United States containing deposits of coal, phosphate, sodium, oil, oil shale, and gas were open to location and acquisition of title. Congress, by its mining laws, provided that claims might be "located" on these lands on the performance of certain conditions. Congress also made provision for issuing patents for claims located under the mining laws. See Wilbur v. United States ex rel. Krushnic, 1930, 280 U.S. 306, 314, 50 S.Ct. 103, 74 L.Ed. 445. When the location of a mining claim was perfected under the law, it had the effect of a grant by the United States of the right of present and exclusive possession. The claim was property in the fullest sense of that term and might be sold, transferred, mortgaged, and inherited without infringing any right or title of the United States. The right of the owner was taxable by the state and was "real property" subject to the lien of a judgment recovered against the owner in a state or territorial court. See id. at 316, 50 S.Ct. 103. However, the Mineral Leasing Act of 1920 effected a complete change of policy in respect of the disposition of lands containing deposits of coal, phosphate, sodium, potassium, oil, oil shale, or gas. Such lands were no longer to be open to location and acquisition of title, but only to lease. Id. at 314, 50 S.Ct. 103 (dictum). A mineral lease does not give the lessee anything approaching the full own-

---

1. "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." 28 U.S. C.A. § 1652.

2. See 1A Moore, Federal Practice ¶ 0.305 [3], at 3045 (2d ed. 1961).

3. See 1A Moore, op. cit., supra, ¶ 0.305 [3], at 3053.

4. 50 Va.L.Rev. 1236 (1964).

5. 1A Moore, op. cit., supra ¶ 0.328, at 3901.

6. As one student commentator has put it: "First, the federal court must determine whether a sufficient federal interest is present to preempt the authority of state law." 50 Va.L.Rev. 1236, 1241 (1964).

ership of a fee patentee, nor does it convey an unencumbered estate in the minerals. Boesche v. Udall, 1963, 373 U.S. 472, 478, 83 S.Ct. 1373, 1376, 10 L.Ed.2d 491 (dictum) (Secretary has authority to cancel lease granted in violation of Act and regulations promulgated thereunder). In the latter case, the Supreme Court stated that,

> "Unlike a land patent, which divests the Government of title, Congress under the Mineral Leasing Act has not only reserved to the United States the fee interest in the leased land, but has also subjected the lease to exacting restrictions and continuing supervision by the Secretary."

Id. at 477–78, 83 S.Ct. 1373. Thus the Secretary is given power to prescribe rules and regulations governing in minute detail all facets of the working of the land leased. 30 U.S.C.A. § 189. The Secretary may direct complete suspension of operations on such land, 30 U.S.C.A. § 209, or require the lessee to operate under a cooperative or unit plan, 30 U.S.C.A. § 226(j). See Boesche v. Udall, 1963, 373 U.S. 472, 478, 83 S.Ct. 1373, 10 L.Ed.2d 491. And as we noted in our original opinion, the public policy of the United States directed at opposing the monopoly of federally-owned mineral deposits requires that the Secretary examine into the qualifications of the real lessee and any assignee of a mineral lease or of a part interest. See 30 U.S.C.A. §§ 181, 184. This includes oil and gas leases "acquired directly from the Secretary under this Act or otherwise * * * (including options for such leases or interests therein)." 30 U.S.C.A. § 184(d) (1). Such "options" are limited as to acreage, 30 U.S.C.A. § 184 (d) (1), and time, 30 U.S.C.A. § 184(d) (2). "No option * * * shall be enforcible if entered into for a period of more than three years * * * without the prior approval of the Secretary." 30 U.S.C.A. § 184(d) (2). By implication, "options" for less than three years may be freely entered into without prior approval. However, "No option * * * shall be enforcible until notice thereof

has been filed with the Secretary * *." 30 U.S.C.A. § 184(d) (2). Furthermore, assignments or subleases of all or part of the acreage included in an oil or gas lease must be approved by the Secretary. See Boesche v. Udall, 1963, 373 U.S. 472, 478, 83 S.Ct. 1373, 10 L.Ed.2d 491; 30 U.S.C.A. § 187a. The Secretary is required to disapprove the "assignment" or "sublease" only for lack of qualification under the Act or for lack of sufficient bond. See 30 U.S.C.A. § 187a. Nowhere in the Mineral Leasing Act of 1920 are the terms "assignment" and "option" defined.

The posture of the instant case is interstitial. The Secretary has granted a lease to Wallis. We deal with claims that are, in essence, an alleged "option" and an alleged "assignment," but which, ultimately, must be approved by or registered with the Secretary. We think, therefore, that there is a sufficient federal interest for the substantive independence of the federal court in determining the claims of McKenna and Pan American.

It might be said that the absence of a congressional definition of "option" and "assignment"—whether they may be oral or arise by operation of trust—implies that we should look to the law of the state. But we are impressed by the fact that the Mineral Leasing Act of 1920 represents a comprehensive scheme of federal regulation. Besides the public policy directed at opposing the monopoly of federally-owned mineral deposits, Congress has expressed recent concern over "a potentially dangerous slackening in exploration for development of domestic reserves of oil and gas so necessary for our security in war and peace." It removed "certain legislative obstacles to exploration for development of the mineral resources of the public lands and [to] spur greater activity for increasing our domestic reserves." S.Rep. No. 1549, 86th Cong., 2d Sess. (1960), reprinted in 1960 U.S.Code Cong. & Ad.News pp. 3313, 3314–15. As Judge Wisdom noted in his dissent, the civil law does not recognize resulting trusts or constructive

trusts and therefore the law of Louisiana differs importantly from the laws of the common-law states. While it might be said that the claim of McKenna for the assignment of part interest in the acreage covered by the lease and the claim of Pan American of the option agreement constitute transactions essentially of local concern and that the resulting litigation is "purely between private parties," we think that the interest of the United States is directly affected. Compare Bank of America Nat'l Trust & Sav. Ass'n v. Parnell, 1956, 352 U.S. 29, 33–34, 77 S.Ct. 119, 1 L.Ed.2d 93. It is clear that the Mineral Leasing Act recognizes the devices of "assignments" and "options" as concomitants to the public policy against monopoly of federally-owned mineral deposits and, on the other hand, the public policy towards development of our mineral resources and increasing our domestic reserves. We do not think the use of these devices as a part of the scheme of carrying forth this public policy should be limited by interstitial restrictions imposed by the law of the State of Louisiana, which are not present in the other states. In a word, we think this is an area for uniformity.[7]

We hold to what we said in our original opinion in that "we would intimate no opinion as to who may ultimately be entitled to prevail in this litigation * * [T]he judgment should be vacated and the cause remanded for re-trial upon the evidence already taken and any additional relevant evidence, and for full and complete findings of fact and conclusions of law on all issues under the applicable principles of federal law."

Rehearing denied.

7. Hodgson v. Federal Oil & Development Co., 1927, 274 U.S. 15, 47 S.Ct. 502, 71 L.Ed. 901, does not lead to a different result. We read Hodgson as fashioning a federal law of fiduciary relationship by drawing on the law of several states. See id. at 19–20, 47 S.Ct. 502.

1. See Mishkin, The Variousness of "Federal Law": Competence and Discretion

WISDOM, Circuit Judge (dissenting):

I respectfully dissent.

I do not say that the Court's decision is likely to start dangerous temblors in American federalism. It has always been in the cards that federal common law would expand as the activities of the national government expanded.[1] For many years, before Erie, the federal "judge followed his own nose"; he "sat down and looked up what relevant federal law there might be in the cases and otherwise decided what the law ought to be * * * though in some few instances the judge might consider relevant state decisions".[2] Moreover, I agree with Judge Henry Friendly's summary of the development, since Erie, of the "new" federal common law: "We may not have achieved the best of all possible worlds with respect to the relationship between state and federal law. But the combination of Erie with Clearfield [Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838] and Lincoln Mills [Textile Workers of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972] has brought us to a far, far better one than we have ever known before."[3] But I do say that in this case the Court's resort to federal common law is so inappropriate as to amount to a deep and uncalled-for cut against the grain of American federalism.

## I.

We sit as an Erie court, bound by the law of Louisiana; bound too by the Rules of Decision Act. Yet in this squabble between private persons the Court holds that the nature of the ownership of the lease, that is, the nature of the lessee's

in the Choice of National and State Rules for Decision, 105 U.Pa.L.Rev. 797 (1957).

2. Morgan, The Future of a Federal Common Law, 17 Ala.L.Rev. 10, 12 (1964).

3. Friendly, in Praise of Erie—And of the New Federal Common Law, 39 N.Y.U.L. Rev. 383, 422 (1964).

interest in the minerals as against third party claimants, is a matter to be determined by judge-made federal common law. The Court brushes aside the state's longstanding public policies against title by parol [4] and against resulting and constructive trusts, devices alien to the civil law.[5] The "jurisprudence of this State

4. In the opinion below Judge Wright correctly noted: "While the legislative declaration that rights in mineral leases are 'real rights and incorporeal immovable[s],' LSA-R.S. 9:1105, has not always been given full effect. [citing cases] * * * [T]he Louisiana Supreme Court has been consistent in reading § 1105 as requiring that contracts affecting such rights comply with the statute of frauds. Arkansas Louisiana Gas Co. v. R. O. Roy & Co., 196 La. 121, 198 So. 768; Davidson v. Midstates Oil Corporation, 211 La. 882, 31 So.2d 7; Wier v. Glassell, 216 La. 828, 44 So.2d 882; Acadian Production Corp. of Louisiana v. Tennant, 222 La. 653, 63 So.2d 343. * * * The rule applies to McKenna's agreement, whether it is considered as creating a joint venture or an agency relationship. See Stack v. De Soto Properties, 221 La. 384, 59 So.2d 428, 430–431; LSA-C.C. Art. 2992. So does it apply to Pan American's option contract. LSA-C.C. Art. 2462." McKenna v. Wallis, E.D.La.1961, 200 F. Supp. 468, n. 13 at 471. In Hayes v. Muller, La.App.1962, 146 So.2d 176, 179, the court held that an alleged joint venture effecting the transfer of an interest in a mineral lease cannot be made the subject of a verbal agreement and cannot be proved by parol evidence. The Louisiana Supreme Court affirmed, 245 La. 356, 158 So.2d 191, 198, commenting, on rehearing, that it had been "zealous * * * to guard against any deviation from the rule" that the "plaintiff cannot show an oral agreement to purchase property for him, and enforce the contract when it has been fraudulently violated (by acquisition in defendant's name), despite the argument made therein that the evidence did not constitute an attack on the title of the defendant but was merely an attempt to profit from and through such title."

5. "Article 21 of the Louisiana Civil Code of 1870 authorizes the courts to apply equitable principles in their decisions. Porter v. Conway, 181 La. 487, 159 So. 725 (1934); see Willey v. St. Charles Hotel [Co.], 52 La.Ann. 1581, 1584, 28 So. 182, 186 (1899); see Franklin, Equity in Louisiana, 9 Tulane L.Rev. 485 (1935). However, it is frequently stated that from a theoretical viewpoint there can be no constructive trust in a civil law jurisdiction. See Patton, Future of Trust Legislation in Latin America, 20 Tulane L.Rev. 542, 548 (1946); see Wisdom, The Louisiana Trust Estates Act, 13 Tulane L.Rev. 70, 83 (1938)." Note, 26 Tul.L.Rev. 262 (1952). See also Note, 25 La.L.Rev. 276, 280 (1964).

Since all transfers of immovable property must be in writing and, under LSA-C.C. Arts. 2275, 2276, 2440, parol evidence is not admissible to vary the terms of a written conveyance or to prove an oral agreement of sale, a defrauded principal or joint venturer cannot through parol evidence prove title to immovables purchased by an agent or joint venturer under an oral mandate. Scurto v. LeBlanc, 191 La. 136, 137, 184 So. 567 (1938); Ceromi v. Harris, 187 La. 701, 175 So. 462 (1930); see Note, 21 Tulane L.Rev. 286 (1946). However, parol evidence may be used to prove fraud or error in an action to rescind written sales of real estate. Baker v. Baker, 209 La. 1041, 26 So.2d 132 (1946); LeBleu v. Savoie, 109 La. 680, 33 So. 729 (1903); cf. Reid v. Phillips, 177 La. 497, 148 So. 690 (1933).

There are, however, a number of loose references in Louisiana decisions to "constructive trusts". McClendon v. Bradford, 42 La.Ann. 160, 7 So. 78, 8 So. 256 (1890); Gervais v. Gervais, 9 Orleans App. 69 (1911); Gaines v. Chew, 2 How. 619, 650, 11 L.Ed. 402 (U.S. 1844); Berthelot v. Isaacson, 5 Cir. 1922, 278 F. 921, 923. A result similar to the common law constructive trust has been attained in Louisiana decisions holding that title to *movable* property which is acquired by an agent through a breach of his fiduciary duty inures to the benefit of the principal. Sentell v. Richardson, 211 La. 288, 29 So.2d 852 (1947); noted in 22 Tulane L.Rev. 196, and 8 La. L.Rev. 223 (1948) (purchase of hospital stock). Or when an agent acquires his principal's property by fraud or error. Assunto v. Coleman, 158 La. 537, 104 So. 318 (1925) (agent purchased principal's property at judicial sale).

Mansfield Hardwood Lumber Co. v. Johnson, 5 Cir. 1959, 268 F.2d 317, 319, 324, is a good example of federal-court handling of Louisiana decisions in this area of the law. There this Court agreed "that the Louisiana Civil Law prohibits the imposition of a constructive trust or equitable lien on property",

\* \* \* has been consistent to the effect that the transfer of an interest in a mineral lease cannot be made the subject of a verbal agreement and cannot be proved by parol evidence." Hayes v. Muller, La. App.1962, 146 So.2d 176, 179. On remand, the law the district judge must conjure up is as uncertain and insubstantial as the "brooding omnipresence in the sky", of which Justice Holmes spoke, because this evanescent law is *not* the articulate voice of a sovereign that can be identified.[6]

The holding of the Court carries alarming implications. If federal common law controls and the claimants hold an equitable title by virtue of a constructive trust, what is Mrs. Wallis's interest? Assuming that Wallis has a part interest as lessee, does his wife have half of his interest as her share in the community? Or is she a common law partner with him? Or does she have no interest in the lease? Are Wallis's children deprived of their legitime, their forced portion of their father's estate, as to their father's interest in the lease? I hope my fears

are all bloodless ghosts. But if a federal court, in the name of interstitial law-making, may concoct a Law of Property, Law of Contracts, Law of Restitution and, perhaps, a Law of Descent and Distribution for Mississippi Mud-Lumps, I foresee the fashioning of some fancy legal systems for a great many federal enclaves within the borders of the states.[7]

## II.

"There is", of course, "no federal general common law".[8] However, the term "federal common law", like Justice Rutledge's substitute term, "law of independent judicial decision",[9] is an acceptable euphemism for federal judicial legislation. No one can quarrel with such law-making when congressional intent and national interest speak in the loud, clear voice of the sovereign. But the fact that there are interstices in a federal statute is not enough in itself to justify a court's applying federal common law. There are interstices in every statute.

Before a court plugs a statutory gap with federal law that is inconsistent with local law and that here is also contrary

---

The Court recognized however that under LSA–C.C. Art. 1847 "a breach of the fiduciary relationship is called fraud [not constructive fraud] and the remedy is, of course, a rescission of the contract or damages. By bringing such relationship under the broad heading of fraud, the Louisiana courts have, in effect, reached the same results as would be reached under the common-law-results which seem to common-law lawyers hard to obtain under a literal interpretation of the Civil Code." Accordingly, in Mansfield the district court rescinded the sale of the plaintiff's stock to the defendant, recognized the plaintiffs as the owners of the stock, and ordered the defendant to render an accounting to the plaintiffs.

All of this adds up to the fact that by different theories the civil law reaches many of the results the common law reaches. There is no exact civilian equivalent to the Angola-American resulting trust or constructive trust. Here, the claimants may suffer from the difference between the two legal systems. But the difference in remedies generally is not so great as to justify the majority's far-out idea that Louisiana's lack of resulting and construc-

tive trusts, as the Lord Chancellor knows them, substantially interferes with the national policy on mineral reserves.

6. "The common law is not a brooding omnipresence in the sky, but the articulate voice of some sovereign or quasi-sovereign that can be identified." Southern Pacific Co. v. Jensen, 244 U.S. 205, 222, 37 S.Ct. 524, 61 L.Ed. 1086. cf. Clark, State Law in the Federal Courts: The Brooding Omnipresence of Erie R. Co. v. Tompkins, 55 Yale L.J. 205, 274 (1946).

7. "Establishing a body of substantive law for federal courts in matters not otherwise of federal concern is not a legitimate end within the scope of the Constitution; thus to frustrate the ability of the states to make their laws fully effective in areas generally reserved to them would be inconsistent with the constitutional plan." Friendly, supra, n. 3 at 397.

8. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188.

9. United States v. Standard Oil Co., 1947, 332 U.S. 301, 308, 67 S.Ct. 1604, 91 L. Ed. 2067.

to established state policies, consideration for the position of the states in the federal system suggests that the Court find congressional intent that federal common law should prevail over state law.[10] "The political logic of federalism supports placing the burden of persuasion on those urging national action."[11] When congressional intent is unclear or when a specific congressional intent never existed, a reasonable criterion is that judge-made common law should not prevail over local law unless that result is manifestly in the national interest. Uniformity for uniformity's sake does not meet this criterion; under Erie and the Rules of Decision Act, diverse local law controls the hum-drum disputes of private litigation that do not raise a federal question and do not conflict with the interests of the United States. In this case, I find no congressional intent and no compelling national interest sufficient to justify an independent federal rule displacing long accepted state law.

This is a dog-eat-dog, no-holds-barred fight between private persons, each crying foul, over the nature of the ownership of a lease. Resolution of the controversy depends upon legally acceptable proof of the relationship of Wallis to McKenna and Pan-American. It is true that the acts generating the litigation took place before execution of the lease. The point in time when these acts occurred, however, is not important to the United States as lessor, as it was in Irvine v. Marshall, 1858, 20 How. 558, 15 L.Ed. 994, since the dispute arose *after title to the mineral leasehold had passed from the United States to Wallis.*[12] Besides, Mc-

10. "The issue that must be determined in each instance is what heed Congress intended to have paid to state law in an area where no heed need constitutionally be paid—more realistically, in Gray's famous phrase, 'to guess what it would have intended on a point not present to its mind, if the point had been present.' We cannot expect that we shall always agree with the answer to such a question; we do have a right to expect that the question shall always be put." Friendly, n. 3, at 410.

11. Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum.L.Rev. 543, 545 (1954).

12. In the instant case the entire title, legal and equitable, to the mineral leasehold passed at the time the lease was executed. In Irvine v. Marshall, on which the Court relied so strongly in the original opinion, the patent had not been issued to either of the competing parties. The Supreme Court recognized, however, that an entirely different rule would apply *once legal title had in fact passed from the United States:*
"We hold the true principle to be this: that whenever the question in any court, State or Federal, is whether a title to land which was once the property of the United States has passed, that question must be resolved by the laws of the United States; but that whenever, according to those laws, the title shall have passed, then the

property, like all other property in the State, is subject to state legislation, so far as that legislation is consistent with the admission, that the title passed and vested according to the laws of the United States."
Pan American Petroleum Corporation v. Pierson, 10 Cir.1960, 284 F.2d 649, cert. denied, 366 U.S. 936, 81 S.Ct. 1661, 6 L.Ed.2d 848 supports Wallis's position. The Court held that the Secretary has no "authority to cancel an oil and gas lease for fraud of a lessee precedent to lease issuance." The Court said: "[T]he government, by the issuance of the lease, has performed the last act required of it to vest in the lessee the right to explore for, produce, market and sell the oil and gas underlying the leased premises." 284 F.2d at 654. The effect of this decision is uncertain, however, in view of Boesche v. Udall, 1963, 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491, holding that the Secretary has the administrative power, beyond § 31 of the Act, to cancel a lease because of an administrative error; § 31, allowing cancellation for the lessee's non-compliance with any of the provisions of the lease, applies only to situations in which a valid lease has been issued. The Court in Boesche was aware of Pan American, but did not discuss the case and spoke only in terms of administrative error. See Miller, The Historical Development of the Oil and Gas Laws of the United States, 51 Col.L.Rev. 506, 530 (1963).

Kenna and Pan-American do not question the validity or effectiveness of the transfer of the mineral leasehold from the United States to Wallis. On the contrary, it is essential to their position that they accept the validity of Wallis's lease: McKenna claims a one-third interest in the lease as a joint venturer; Pan-American demands an assignment of the lease under an option contract.

Whether Wallis holds the lease for himself or for others and whatever the interests of McKenna and Pan-American may be as against Wallis, the United States is protected by the terms of the lease and by statutory requirements that the Secretary of Interior investigate and approve Wallis and any assignee or sublessee. The United States owns the fee and exercises tight control over the lease through the Secretary's power to prescribe rules and regulations governing in minute detail all facets of the working of the land leased.

The United States has of course a proper interest in knowing the nature of the lessee's ownership. In the first place, the policies of the United States in favor of conservation of national resources and prevention of monopolies require the Secretary to know the true owners of the lease. The Act provides, therefore, for full disclosure of the lessee's interest in order to prevent lease-grabbing through the use of strawmen. Second, for obvious reasons, it is administratively convenient for the Secretary to deal with the record owner as the true owner. In general, these policies and interests will necessarily be affected adversely by the common law's recognition of unwritten, undisclosed trusts arising from the breach of a fiduciary relationship unknown to the Secretary. On the other hand, the civilian antipathy to oral, hidden trusts and equitable liens works hand in glove with the policies and interests of the United States. Certainly in this case, Judge Wright's adjudication that McKenna and Pan-American have no provable claim to the lease represents the optimum Congress and the Secretary could expect in administrative conven-

ience and in the disclosure of outside interests.

Beyond all of this, a serious question exists as to whether the doctrine of separation of powers permits the judiciary, in effect, to force lessees upon the executive. And there is also the question whether the Act allows a court to select as assignees persons whom the Secretary has not investigated and formally approved. The policy objectives of the statute and its protective provisions may be easily circumvented, if courts have the power to reverse the Secretary's choice of lessee by recognizing third parties as the legal lessees by virtue of an unwritten option, assignment, or joint venture.

### III.

In concluding that the issue for decision is a federal matter the Court, if I may say so, relied on this syllogism: (1) the federal Mineral Leasing Act permits options and assignments of leases approved by the Secretary; (2) here, in essence, the claims are an alleged option and an alleged assignment; (3) therefore the claims are a federal matter. This reasoning does not stand up.

The Court's conclusion is a glaring non sequitur, unless the terms "option" and "assignment" are taken to include contested, amorphous claims such as McKenna and Pan-American present. But this is an impossible construction of the Act. Congress could have intended only that the Secretary approve uncontested options and assignments or, possibly, such agreements validated by adjudication. If a court has decreed the validity of a formal lessee's total ownership of a lease against third persons, or, in another case, if a court should validate all or part of the transfer of a lessee's interest, it is difficult for me to understand what difference it makes to the United States whether the Court has used state law or federal common law.

The Secretary has the ability to prevent a lease from falling into the hands of someone who should not have it. The Secretary's determination that a lease or

an assignment of a lease meets the requirements of the Act evidences compliance with the rules and regulations protecting the interests of the United States. That determination is unquestionably a federal matter. But the rights of action, if any, of McKenna and Pan-American against Wallis are state-created. And their validity or invalidity is determinable without regard to the Act, the regulations, or the Secretary's approval. In short, here, as in tax law or in federal procedure or in many other areas of the law where the nature of a litigant's interest unquestionably is important to the federal government—absent a conflict between the State and the Nation, accepted principles of federalism recognize that state law should determine the nature of the litigant's property interest, and federal law should determine the federal rules applicable to that particular type of property ownership.[13]

The Court's reasoning seems to overlook McKenna. McKenna claimed as a joint venturer, not as an assignee. I do not see how his claim can be lumped with Pan-American's claim. If the reference in the Act to secretarial approval of options and assignments makes a federal matter of all litigation touching such contracts, the statutory silence with respect to joint ventures should be taken to mean that McKenna's alleged joint venture with Wallis is not a federal matter. I do not underscore this point. I mention it only to demonstrate that no special federal significance should be attached to the mention of "options" and "assignments" when it is manifest that the Secretary's approval of all original leases and all transfers is required under the Act.

## IV.

After finding that the plaintiffs' claims were "federal matters", the Court still could not fashion and apply federal common law without first holding that application of state law would affect, seriously and adversely, the interests of the United States. The Court managed this conclusion in just one sentence:

"We do not think the use of these devices [assignments and options] as a part of the scheme of carrying forth this public policy [the development of our mineral resources and increasing our domestic reserves] should be limited by the interstitial restrictions imposed by the law of the State of Louisiana, which are not present in the other states."

The fact is, Louisiana imposes no special limitations, interstitial or otherwise, on assignments and options. Louisiana does require, as do common law states, that all contracts affecting immovables (real property), including mineral leases, be in writing. The Statute of Frauds is no stranger to the common law. The only pertinent Louisiana limitation affecting mineral leases is the rule against resulting and constructive trusts. This established civilian principle—as a practical matter, a principle rarely called into operation—is the sole and narrow basis for the Court's holding that if state law is applied the Nation will suffer.

If this one-sentence finding on which the Court's decision rests is corrected and paraphrased realistically, the holding shakes down to this bizarre result:

Trusts ex maleficio are part of the congressional scheme for carrying out

---

13. Professor Hart comments: "But the decisions yield no simple rule of thumb for choosing. They cannot. Particularly is this so in the subtler situations in which federal legislation is building upon legal relationships established by the states and its power is one of characterization only and not of alteration of the substance of the relation. Federal tax law, for example, can say what state-created interests are to be taxed, and can characterize them in any way it chooses; but it cannot create the interests. Similarly, federal bankruptcy law can dissolve state-created interests in any way it thinks equitable; but it is hard to see how it can create, or recognize in liquidation, interests which never had any existence under state law." Hart, The Relations Between State and Federal Law, 54 Col.L.Rev. 489, 535 (1954).

the national policies on mineral resources and monopoly. In litigation between private persons over the nature of the ownership of a federal mineral lease, national policies on mineral resources and monopoly will suffer unless courts recognize beneficial title to the lease in a claimant whom the Secretary has not investigated and has not approved as lessee, and who may be unknown to the Secretary.

To restate this holding in accurate, realistic terms is to expose the unreal, speculative character of the Court's notion that federal common law controls this case.

## V.

I find no decisional and no doctrinal support in the majority's position. I turn now to a small sampling of leading cases.

Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, was the Supreme Court's first important decision on federal common law after Erie. The United States sued to recover on an express guaranty of prior endorsements on a government check containing a forged endorsement. The court held that state law was inapplicable. The United States was a party to the litigation, but more importantly since the right of the United States to recover for conversion of a government check is a federal right, the courts of the United States could properly formulate a rule of decision. Uniformity was desirable; state law would be "singularly inappropriate" because its application to commercial paper of the United States "would subject the rights and duties of the United States to exceptional uncertainty".

Mr. Justice Douglas, author of the Clearfield opinion has recently cast some doubt on its scope:

"As respects the creation by the federal court of common-law rights, it is perhaps needless to state that we are not in the free-wheeling days antedating Erie R. Co. v. Tompkins, 304 U.S. 64, [58 S.Ct. 817, 82 L.Ed. 1188]. *The instances where we have created federal common law are few and restricted.* In Clearfield Trust Co. v. United States, 318 U.S. 363 [63 S.Ct. 573, 87 L.Ed. 838], we created federal common law to govern transactions in the commercial paper of the United States; and we did so in view of the desirability of a uniform rule in that area. Id., p. 367 [63 S.Ct. p. 575]. But even that rule was qualified in Bank of America Nat. Trust & Savings Ass'n v. Parnell, 352 U.S. 29 [77 S.Ct. 119, 1 L.Ed.2d 93]." (Emphasis supplied.) Wheeldin v. Wheeler, 1963, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605.

This brings us to Bank of America National Trust and Savings Association v. Parnell, 1956, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93, one of the two authorities cited in the opinion on rehearing for the majority's principal holding. As in the instant case, Parnell was a diversity action between private persons. The suit was over stolen bearer bonds (in a general sense analogous to the lease here) issued by the Homeowners Loan Corporation, a federal agency, and guaranteed by the United States. The Bank sued to recover the value of the bonds Parnell had cashed. The Court held that federal law controlled the question whether the bonds were "overdue", because it related to the nature of the rights and duties of the Government. But the Court held also that state law controlled the question whether Parnell had met the burden of proving good faith. "Government securities" generate immediate interests of the Government, but the "present litigation is purely between private parties and does not touch the rights and duties of the United States." The possibility that "the floating of securities of the United States might somehow or other be adversely affected by the local rule of a particular State regarding the liability of a converter * * * is far too speculative, far too remote a possibility to justify the application of federal law to transactions essentially of local concern". 352 U.S.

at 33, 77 S.Ct. at 121. See Wright, Federal Courts, § 60 at 216 (1963). Parnell is clearly contrary to the majority opinion.

Free v. Bland, 1962, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180, turned on a specific Treasury regulation designed to make savings bonds attractive to purchasers by a survivorship provision eliminating the necessity for expensive or time-consuming probate proceedings. To allow state law to frustrate this purpose would permit the states to constrict measures designed to help the federal treasury borrow money. In line with Clearfield and Parnell, the Court applied federal law. The Court made the following comment on Parnell, a comment appropriate here:

> "[T]hat case [Parnell] held that, in the absence of any federal law, the application of state law * * * was permissible, *because the litigation between the two private parties there did not intrude upon the rights and the duties of the United States,* the effect on the only possible interest of the United States—the floating of securities—being too speculative to justify the application of a federal rule."

In Free v. Bland, state law conflicted with a distinct federal rule that the Treasury had consistently advocated and that supported the paramount interests of the United States.

Although the United States was a party in Clearfield and its presence in litigation may in some cases be a factor, the principal teaching of Clearfield, Parnell, and Free v. Bland, as a group, is that federal common law is applicable when the state law substantially conflicts with the rights of the United States and where lack of uniformity causes "exceptional uncertainty" in determining the rights and duties of the United States.

Textile Workers Union of America v. Lincoln Mills of Alabama, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, is not cited in the Court's opinion on rehearing but apparently is implicit in the Court's reliance on interstitial law-making. Lincoln Mills involved specific performance of an arbitration clause in a labor contract. Under section 301 of the Taft-Hartley Act, federal courts have jurisdiction over suits on labor contracts affecting interstate commerce, although there is no specific provision about enforcing arbitration clauses. The Supreme Court held that section 301 was a mandate to fashion and apply a federal common law governing labor contracts. It should be remembered, however, that specific performance of arbitration agreements was prohibited by the law of Alabama, contrary to the strong congressional policy in favor of enforcement of labor arbitration. "To be consistent with that [congressional] policy you need to have specific performance of the arbitration agreement; that would bolster the policy rather than detract from it; so in this area the issue may be federal, that is, subject to federal common law rather than state law if that issue, though not covered squarely or impliedly by any federal statute or any federal treaty or constitutional provision, nevertheless would substantially affect the policy of such federal law." Morgan, The Future of Federal Common Law, 17 Ala.L.Rev. 10, 14 (1964). Again, as "Judge Rives [has] pointed out, there was behind Lincoln Mills a clear discernible federal policy in favor of collective bargaining agreements" and also "a huge body of federal labor law on which the courts draw in fashioning a substantive body of labor contract law".[14] This is legitimate "interstitial legislation" because of discernible congressional policy. Dean Cowen, more accurately, calls it a "delegation" by Congress to the Judiciary of a portion of its legislative power.[15] There is of course no federal policy touching resulting and constructive trusts of federal mineral leases; no substantial conflict here between the state and federal policies; no clear mandate to fashion a

---

14. Morgan, The Future of Federal Common Law, 14 Ala.L.Rev. 10, 31 (1964).

15. Id. at 17.

federal substantive law of trusts ex maleficio affecting mineral leases.

The other case the Court relies on is Francis v. Southern Pacific Co., 1948, 333 U.S. 445, 68 S.Ct. 611, 92 L.Ed. 798.[16] But Francis lends no support to the majority. In Francis, the Supreme Court based its decision on the accepted "and well-settled construction of the Act" that the liability of an interstate carrier to one riding on a free pass was determined not by state law but by the Hepburn Act. This construction has been "unchallenged" in the Supreme Court and "in Congress too". The Transportation Act of 1940 reenacted the free pass provisions "without further change or qualification". The Court said, therefore, that it was not "writing on a clean slate"; "the long and well-settled construction of the Act plus reenactment of the free-pass provision without change of the established interpretation" had become "part of the warp and woof of the legislation." "[S]tate law which conflicts with this federal rule governing interstate carriers must therefore give way by virtue of the Supremacy Clause." [17]

The "presence of a federal statute does not necessarily imply that there is a congressional intent that any particular issue be resolved by reference to federal law".[18] The Federal Communications Act is unquestionably a comprehensive statute regulating a subject of national importance in which the United States has an overriding interest. Just as the Mineral Leasing Act regulates the issuance and transfer of federal mineral leases, the Communication Act regulates the issuance and transfer of radio licenses. Regents of the University System of Georgia v. Carroll, 1950, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363, concerned the construction of a contract transferring the licensee's control of its radio station to a broadcasting company. When the licensee repudiated the contract, the broadcasting company sued for an accounting. The Court held that state law governed the relationship between the parties as established by the contract between the parties. The Court's reasoning is clearly applicable to the parallel situation the instant case presents:

"Congress has enabled the Commission to regulate the use of broad-

16. A note, The Competence of Federal Courts to Formulate Rules of Decision, 77 Harv.L.Rev. 1084, 1090 (1964) contrasts Francis v. Southern Pac. Co. with Regents of the Universal System v. Carroll, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363: "The Supreme Court occasionally has been guilty of failure to inquire into the extent of the interest evinced by a federal statute 'involved' in a litigation. In Francis v. Southern Pac. Co., for example, * * *. In contrast with Francis, the Court made careful inquiry into the interest evinced by the legislation 'involved' in Regents of the Univ. Sys. v. Carroll. There it was held that although the Federal Communications Commission has authority to regulate the transfer of radio licenses, the construction of contracts transferring the control of a station or its property is governed by state law." See also Wright, Federal Courts § 60 at 218.

17. 333 U.S. at 450, 68 S.Ct. at 613.

18. Note, The Competence of Federal Courts to Formulate Rules of Decision,

77 Harv.L.Rev. 1084, 1090 (1964). "Although Congress has in rare instances delegated to the judiciary the authority to create a comprehensive body of decisional law in a particular area, the role of the courts is ordinarily interpretative and implemental. The exercise of this judicial competence is premised on the inevitable incompleteness of legislation. A statute may be sufficiently vague that its application to a particular controversy is unclear; it may have omitted ancillary but necessary procedural rules; or it may have created a cause of action whose elements are defined only in general terms, leaving refinements to the judiciary. In these cases it is the task of the judiciary to fill in the legislative lacunae in the manner most compatible with the statutory framework. The scope of judicial lawmaking varies inversely with the clarity of the policies discernible from the statute and its legislative history, but judicial lawmaking competence is properly limited to issues in which the congressional program evinces a legislative interest." Id. at 1089.

casting channels through a licensing power. \* \* \* The Commission may impose on an applicant conditions which it must meet before it will be granted a license, but the imposition of the conditions cannot directly affect the applicant's responsibilities to a third party dealing with the applicant. \* \* \* We do not read the Communications Act to give authority to the Commission to determine the validity of contracts between licensees and others." 338 U.S. at 600, 602, 70 S.Ct. at 337, 338.

Within the scope of its objectives as a mineral leasing law, the Act here is comprehensive and no doubt has many interstices to be filled, in the proper case, by judicial resort to federal common law. But the Act does not purport to go beyond the lessee and lessor. The Secretary, like the Federal Communications Commission, may impose conditions that the lessee must meet, but the Secretary, although interested in disclosure of the nature of the lessee's interest, has not tried to affect the legal relationship of the lessee to third parties. The controversy between the litigants, as it did in *Carroll*, takes place outside the Act, not within an interstice of the Act.

The only case squarely in point is Blackner v. McDermott, 10 Cir. 1949, 176 F.2d 498, which the Court noted as "involving a claim of 'joint venture' highly similar to McKenna's claim here", but declined to follow. The Tenth Circuit applied the law of Wyoming for the reason I would apply the law of Louisiana: the issue was "the relationship of the parties each to the other in respect of the leasehold estate."

Decisions in this circuit in the area of federal decisional law are not distinguished for their consistency. In United States v. Sylacauga Properties, Inc., 5 Cir., 1963, 323 F.2d 487, we held that state law was inapplicable in a suit to foreclose an FHA mortgage under the National Housing Act. See also United States v. Taylor, 5 Cir. 1964, 333 F.2d 633, holding that federal law rather than state law applies to the interpretation of a disputes clause in a contract between private parties where there is a sufficient federal interest. The federal interest was in controlling and effecting prompt settlement of disputes between a sub-contractor and a prime contractor engaged in construction work for the Atomic Energy Commission. But see United States v. Yazell, 5 Cir. 1964, 334 F.2d 454, an action to recover on a note for a loan from the Small Business Administration. This Court held, surprisingly, perhaps, that the capacity of a married woman to contract with the federal government is controlled by state law, notwithstanding the effect such a decision might have on the administration of the national program for assistance to small business.

Leiter Minerals, Inc. v. United States, 5 Cir. 1964, 329 F.2d 85; affirmed subject to abstention, 1957, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267, cannot be reconciled with the majority's holding in the instant case. In 1935, the United States, acting under the Migratory Bird Conservation Act, contracted to purchase almost 9000 acres of land in south Louisiana. The seller reserved the minerals for a ten-year period with provisions for extensions of five years so long as certain minimum use was made of the rights. In Louisiana the sale or reservation of mineral rights establishes only a servitude or right to extract the minerals. Servitudes prescribe in ten years for nonuse, a prescription that cannot be avoided by contract. In 1938, before the conveyance, the Louisiana legislature adopted a statute providing that prescription of mineral rights should not run against the State or United States. This legislation was replaced by Act 315 of 1940 restricting the exemption to the United States. The Louisiana court held that Act 315 would not apply if the deed provided for a mineral servitude for fixed term, but would apply if the term were indefinite. Leiter Minerals, Inc., successor to the seller of the land, filed suit in 1953 to have itself declared owner of the mineral rights. The United States

then filed suit to quiet title. This Court, applying state law, held that the reservation was for an indefinite term. Here, therefore, we have the United States a party to the litigation concerning its rights under a contract entered into pursuant to a federal statute. Directly affected are national policies under that statute, policies relating to the conservation of our national resources, and settled policies of federal land acquisition. Presumably the Government paid more to obtain the favorable term. "It seems reasonable to assume a congressional intent that rights for which the Government has paid should not be taken away by operation of special state legislation directed against the United States." Note, 78 Harv.L.Rev. 891, 895 (1965). Finally, the case involved state legal concepts exceptionally complex and foreign to common law concepts. I must say, if federal common law applies in the case now before this Court, Leiter Minerals, Inc. was an *a fortiori* case for federal common law. This Court held otherwise:

> "We have no doubt that the Congress could make federal law applicable, but we are equally clear that it had no intention to do so when it merely authorized the contract by which the United States acquired the property. State law must govern in the absence of a federal statute making federal law applicable. * * * [T]he rules of decision act always has had 'application to state laws, strictly local, that is to say, to the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intra-territorial in their nature and character.' Swift v. Tyson, 1842, 41 U.S. (16 Pet.) 1, 18, 10 L.Ed. 865." Leiter Minerals, Inc. v. United States, 5 Cir. 1964, 329 F.2d 85, at 90.

In sum, I can find no decisional or doctrinal justification for applying judge-made federal common law to a private

dog-fight in which the federal government's interest, if any, seems to me to be that of a bored spectator. The speculation that trusts ex maleficio are part of the congressional scheme for conserving natural resources hangs by too fine a thread for me to see the connection. Under Erie and the Rules of Decision Act, Louisiana may decide for itself whether to preserve its civil law institutions or adopt alien institutions. The philosophy that brought American federalism into being keeps the national government out of local transactions involving only the determination of the nature of the legal relation of one person to another.